IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCEP LUSOL HOLDINGS LIMITED | ) | |
| | ) | |
| Plaintiff and Counterclaim defendant, | ) | |
| | ) | |
| v. | ) | |
| PERMATEX, INC. and | ) | Civil Action No. –CV-05-141(KAJ) |
| ULTRAMOTIVE CORPORATION | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF**

**<u>DEFENDANTS' PROPOSED CONSTRUCTION OF DISPUTED CLAIM TERMS</u>**

John G. Harris, Esq. (No. 4017)
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Tel. (302) 778-7500
Fax (302) 778-7557

OF COUNSEL:
Lloyd McAulay
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Tel. (212) 521-5400
Fax: (212) 521-5450

**Table of Contents**

I.    INTRODUCTION ................................................................................................1

    A.    Claim Terms Should Be Given Their Ordinary Meaning.........................1

    B.    Notice Is a Primary Function of the Claim Language ..............................2

II.   FACTUAL BACKGROUND .............................................................................4

    A.    The Parties and the Status of the Litigation .............................................4

    B.    General Description of the Relevant Technology.....................................4

    C.    The Patent in Suit.....................................................................................5

    D.    Prosecution History..................................................................................7

III.  THE LAW OF CLAIM CONSTRUCTION .......................................................7

IV.   DEFENDANTS' PROPOSED CONSTRUCTIONS AND ANALYSIS IN
    SUPPORT .........................................................................................................11

    A.    "Tilt valve"..............................................................................................12

    B.    "Hinge assembly" ...................................................................................14

    C.    "A nozzle assembly sealingly engageable with the hinge assembly"....14

    D.    "The nozzle assembly being rotatable ... between open and closed
        positions" .................................................................................................20

    E.    "Actuator portion" ..................................................................................20

V.    SUMMARY AND CONCLUSION ....................................................................22

## Cases

Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573 (Fed.Cir. 1996) ............................. 9

Autogiro Co. of Am. v. United States, 384 F.2d 391 (Ct. Cl. 1967) .............................................. 9

Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701 (Fed. Cir. 1997) ........ 10

Biogen, Inc. v. Berlex Laboratories, Inc., 318 F.3d 1132 (Fed. Cir. 2003) .................................. 20

CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359 (Fed. Cir. 2002) ........................................ 8

Cont'l Paper Bag Co. v. E. Paper Bag Co., 210 U.S. 405 (1908) ................................................... 8

Cultor Corp. v. A.E. Staley Manufacturing Co., 224 F.3d 1328 (Fed. Cir. 2000) ....................... 21

DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314 (Fed. Cir. 2001) ......................................... 9

Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722 (2002) .............................. 2

Gentex Corp. v. Donnelly Corp., 69 F.3d 527 (Fed. Cir. 1995) ............................................... 9, 17

Hoganas AB v. Dresser Industries, Inc., 9 F.3d 948 (Fed. Cir. 1993) ......................................... 11

Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111 (Fed.Cir.2004)  8

Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323 (Fed.Cir.2001) ........................ 7

Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968 (Fed.Cir.1999) ............................... 10

Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533 (Fed.Cir.1991) ...................................... 10, 21, 22

Markman v. Westview Instrs., Inc., 52 F.3d 967 (Fed.Cir.1995) .......................................... 7, 8, 13

Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367 (Fed.Cir.2003) ..................................... 9

Merrill v. Yeomans, 94 U.S. 568 (1876) ........................................................................................ 3

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) ...................................................... 8, 9, 10

Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298 (Fed. Cir. 1999) ............................... 7

Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350 (Fed. Cir. 1999), cert. denied, 529

U.S. 1037 (2000) ................................................................................................... 10, 18

Quantum Corp. v. Rodime, PLC, 65 F.3d 1577 (Fed.Cir.1995) ................................................... 10

SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc., 242 F.3d 1337 (Fed.

Cir.2001) ............................................................................................................... 9, 20

Seachange International, Inc. v. C-Cor, Inc., 413 F.3d 1361 (Fed.Cir.2005) .............................. 10

Slimfold Mfg. Co. v. Kinkead Industries, Inc., 810 F.2d 1113 (Fed. Cir. 1987)............................. 9

Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002) ............................ 8

Thermalloy, Inc. v. Aavid Eng'g, Inc., 121 F.3d 691 (Fed.Cir.1997)............................................. 8

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996) ................................. 7, 8, 10

Wang Laboratories, Inc. v. America Online, Inc., 197 F.3d 1377 (Fed. Cir. 1999) .................... 21

Warner-.Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 (1997) ....................................... 3

White v. Dunbar, 119 U.S. 47 (1886) .......................................................................................... 8

**Statutes**

35 U.S.C. § 112, ¶ 2 ..................................................................................................................... 7

Defendants, Permatex, Inc. and Ultramotive Corporation (collectively, "Defendants"), respectfully submit the following memorandum in support of their proposed construction of disputed claim terms of U.S. Patent 6,685,064 ("the '064 patent").

## I.    INTRODUCTION

### A.    Claim Terms Should Be Given Their Ordinary Meaning

The claims of a patent measure the invention. It is the province of the Court to determine to meaning of disputed terms in the claims of the patent, so as to define the legal boundaries of the patent grant. The Court of Appeals for the Federal Circuit and the Supreme Court, through their decisions, have provided rules and guidelines which should inform the Court in its construction of patent claim terms.

In this brief, Defendants show why their proposed constructions of disputed claim terms of the patent in suit comport fully with the guidance provided by the Federal Circuit and the Supreme Court. Defendants' proposed constructions begin and remain centered on the language of the claims themselves, consistent with the heavy presumption that claim terms should be given their ordinary meaning, as understood by one of ordinary skill in the relevant art, in view of the patent's specification and prosecution history.

In contrast, Plaintiff has offered claim construction positions that are at odds with the language of the claims, which do not find support in the specification, which blur the boundaries of the patent in a manner unfair to the public, and which lead the patent in suit to read on the prior art. In particular, with their eyes clearly fixed on the accused devices, Plaintiff contorts the meaning of the words "sealingly" and "engageable" to arrive at a construction of the claim phrase "nozzle assembly sealingly engageable with the hinge assembly" that is completely

1

untenable.  The Court should not condone such practices by adopting Plaintiff's proposed construction.

**B.**     <u>**Notice Is a Primary Function of the Claim Language**</u>

A patent is a grant issued by the United States Patent and Trademark Office.  The patent grants the patent owner the right to exclude others from a defined zone of technology.  The claims of the patent perform this defining function.  The claims give notice to the public as to what constitutes trespass, and provide the means by which the public can guide itself to avoid trespass.

This exclusion right is abused if the claims leave the public in a quandary as to what it can and cannot do.  That is a major reason why Section 112 of the Patent Act requires that the claims specifically define the zone of technology which the patentee considers his invention.

It is a violation of the grant for the patentee to assert a claim in a zone of technology which is not clearly set forth in the patent claims.

This notice function has been long recognized as one of the most critical doctrines in patent law.  As a doctrine, it is perhaps second in importance only to the basic doctrine that the scope of a patent cannot encompass prior art and must be non-obvious over the prior art.

In a unanimous opinion, The U.S. Supreme Court , in the <u>Festo</u> case, stated"

> The monopoly is a property right; and like any property right, its
> boundaries should be clear.  This clarity is essential to progress,
> because it enables efficient investment in innovation.  A patent
> holder should know what he owns, and the public should know
> what he does not.  For this reason, the patent laws require inventors
> to describe their work in "full, clear, concise and exact terms".

<u>Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, 535 U.S. 722, 730-31 (2002).

And, in <u>Warner-Jenkinson</u>, the Supreme Court in 1997 stated:

> Mindful that claims do indeed serve both a notice and a definitional function, we think the better rule is to place the burden on the patent holder to establish the reason for an amendment during patent prosecution…
>
> The presumption we have described, one subject to rebuttal if an appropriate reason for a required amendment is established, gives proper deference to the claims in defining the invention and providing public notice….

Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 33 (1997)

The primacy of this notice requirement is no new feature of patent law. It was recognized as early as 1876, when the U.S. Supreme Court stated that

> If the patentee is also entitled to a patent for a product of this distillation, and has failed, as we think he has, to obtain it, the law affords him a remedy, by surrender and reissue. When this is done, the world will have fair notice of what he claims, of what his patent covers, and must govern themselves accordingly…
>
> The public should not be deprived of rights supposed to belong to it, without being told what limits those rights.

Merrill v. Yeomans, 94 U.S. 568, 573 (1876).

It is recognized that at times there is difficulty in clearly defining the zone of the device or method that constitutes the invention. That zone, however, must: (a) be reasonably indicated by the claim language; and (b) be consistent with the specification of the patent, so as to avoid misleading the public as to what would constitute trespass.

In Defendants' opinion, the teachings of the patent, as shown in its specification and drawings, completely fail to provide any notice to the public that the claim language "nozzle assembly sealingly engageable with the hinge assembly" means what has been asserted by Plaintiff.

3

## II.    FACTUAL BACKGROUND

### A.    The Parties and the Status of the Litigation

The Plaintiff/Counterclaim Defendant in this matter is Rocep Lusol Holdings Limited ("Rocep"). Rocep is the assignee of U.S. Patent No. 6,685,064 ("the '064 patent"), the patent at issue in this case.

The Defendants/Counterclaim plaintiffs are Permatex Inc. ("Permatex") and Ultramotive Corporation ("Ultramotive"). Permatex is a customer of Ultramotive. Ultramotive provides pressurized cans of silicone to Permatex, which are marketed under the trade name "POWERBead."

None of the parties are related entities.

Rocep filed suit on March 10, 2005, alleging infringement of certain claims of the '064 patent by the POWERBead dispensing cans. Defendants answered on August 5, 2005, denying infringement and counterclaiming for noninfringement and invalidity of the '064 patent.

### B.    General Description of the Relevant Technology

The technology at issue in this case involves containers that dispense a product. Such dispensing containers are common and well-known; examples include such everyday items as cans for dispensing aerosol spray, whipped cream or shaving cream. Normally, the container has a valve through which the product can flow out of the container. The container is pressurized, so that when the valve is opened, the product is forced out of the valve opening.

The valve has a short stem to direct the product as it comes out. Typically, there is a nozzle that attaches to the valve stem, to provide a longer extension and greater control when dispensing the product than that provided by the short stem of the valve.

To use such a dispenser, the user either depresses or tilts the nozzle. Such action causes the valve to open, which allows the product to flow out of the container and through the valve, stem and nozzle, under pressure of propellant within the container. When the user stops depressing or tilting the nozzle, the valve is returned to a closed state, due to the pressure of the propellant in the container (and the elasticity of the rubber grommet that holds the valve stem in place). While in some cases the user can apply his finger directly to the nozzle, other dispensers have a lever mechanism that engages with the nozzle, so that the user only has to press the lever to operate the dispenser and cause product to be released.

### C.    The Patent in Suit

The '064 patent issued on February 3, 2004 and is assigned to Plaintiff. It is directed to the type of dispenser containers described above. In particular, it describes a particular pressurized container for dispensing viscous product material, such as silicone sealants or caulk for tiles.

As discussed in the Summary of the Invention, a dispenser according to the invention of the '064 patent features a can 12[1] filled with product under pressure. ('064 patent, Col. 1, lines 5-8). A valve 14 with a stem 30 is on the top of the can. ('064 patent, Col. 1, line 27 and lines 45-48). The patent identifies that valve as a tilt valve. ('064 patent, Col. 1, lines 45). The valve stem 30 has a thread on the outside to allow a nozzle 20 to screw onto the tilt valve stem. ('064 patent, Col. 5, lines 5-8).

The '064 patent describes using a lever 18 to open the valve. The lever is attached to a hinge assembly 16 that is attached to the container. ('064 patent, Col. 1, line 30 and Col. 5, lines

---

[1] The number "12" and the succeeding component numbers are provided for ease of reference to the Figures provided in the '064 patent.

29-33). The user opens the valve by pressing down on the lever that presses upon the nozzle. ('064 patent, Col. 6, lines 1-2). Since the nozzle is screwed onto the valve stem, the pressing of the lever against the nozzle also pushes down the valve stem and the valve is opened. ('064 patent, Col. 6, lines 3-4, Col. 3, lines 30-36). The portion of the lever that comes into contact with the nozzle is referred to in the patent as the **bearing portion** of the lever. ('064 patent, Col. 1, lines 33-36). The part of the nozzle that the lever comes into contact with is referred to as the **actuator portion** 90 of the nozzle assembly. ('064 patent, Col. 1, lines 33-36).

The actuator portion of the inventive nozzle assembly has a cam surface, i.e., a surface with at least one "bump" 96 or variation on it. ('064 patent, Col. 1, lines 34-36). By rotating the nozzle, the user can raise or lower the lever, depending on whether or not the lever 18 is in contact with a "bump" 96 of the cam surface. Thus, the cam surface allows the nozzle assembly to have an **open** and a **closed** position. ('064 patent, Col. 1, lines 59-65). If the bearing portion of the lever 18 is on the "bump" 96, then the lever is in a raised position and the lever can be depressed so as to cause the valve to unseal and allow product to be released. (Id.) This would be the "open" position. If the bearing portion is not on the bump, then the lever is not raised and the lever cannot be depressed, so the valve remains in the closed position and the product is not released. This would be the "closed" position of the nozzle assembly. (Id.)

Claim 1 of the '064 patent recites this dispensing apparatus as follows:

> A dispensing apparatus for dispensing a product from a container, said apparatus comprising:
> a container;
> a product chamber within the container;
> a tilt valve adjacent to the product chamber and having a valve stem provided with an external thread;
> a hinge assembly attached to the container;

6

a lever hingedly attached to the hinge assembly and comprising a bearing portion; and

a nozzle assembly sealingly engageable with the hinge assembly and provided with an internal thread engaged with the external thread of the valve stem,

the nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions of said nozzle assembly and including an actuator portion provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes movement of the actuator portion to open the valve and permit flow of the product out of the apparatus.

### D.    Prosecution History

The claims were amended during the prosecution.  Of particular relevance, in the

Preliminary Amendment dated October 9, 2002, claim 1 was amended to limit the valve

of the inventive device to a "tilt valve" having a stem with an external thread.  See

Exhibit 5 to the Chin Declaration, page RL-0791.

### III.    THE LAW OF CLAIM CONSTRUCTION

Claim construction is a matter of law for the court.  Markman v. Westview Instrs., Inc.,

52 F.3d 967, 979 (Fed.Cir.1995).  In construing claims, the analytical focus must begin and

remain centered on the language of the claims themselves, for it is that language that the patentee

chose to use to "particularly point[ ] out and distinctly claim[ ] the subject matter which the

patentee regards as his invention."  Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d

1323, 1331 (Fed.Cir.2001) (quoting 35 U.S.C. § 112, ¶ 2).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the

intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in

evidence, the prosecution history.  Such intrinsic evidence is the most significant source of the

legally operative meaning of disputed claim language."  Vitronics Corp. v. Conceptronic, Inc.,

90 F.3d 1576, 1582 (Fed. Cir. 1996).

All intrinsic evidence is not equal, however. Id. The court must start with the claim language. Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves.") See also Thermalloy, Inc. v. Aavid Eng'g, Inc., 121 F.3d 691, 693 (Fed.Cir.1997) ("[T]hroughout the interpretation process, the focus remains on the meaning of claim language.") It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed.Cir.2004)). Because the patentee is required to "define precisely what his invention is," it is "unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." Id. (quoting White v. Dunbar, 119 U.S. 47 (1886)); see also Cont'l Paper Bag Co. v. E. Paper Bag Co., 210 U.S. 405, 419 (1908) ("the claims measure the invention").

There is a "heavy presumption" that a claim term carries its ordinary and customary meaning, i.e., that a term means what it says, unless that meaning is clearly and unambiguously contradicted by the specification (i.e., when the inventor has acted as his own lexicographer and plainly defined a claim term within the specification). CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002); Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002).

If the claim language is clear on its face, then consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is justified in view of the specification and prosecution history. If there is ambiguity, then consideration of the rest of the intrinsic evidence is directed to resolving, if possible, the lack of

8

clarity, beginning with the specification and concluding with the prosecution history. <u>See</u>

<u>Vitronics</u>, 90 F.3d at 1582. <u>See</u> <u>also</u> <u>Markman</u>, 52 F.3d at 979 ("Claims must be read in view of

the specification, of which they are a part."). As the Federal Circuit instructs, "[c]laims are not

interpreted in a vacuum, but are part of and are read in light of the specification." <u>Slimfold Mfg.</u>

<u>Co. v. Kinkead Industries, Inc.</u>, 810 F.2d 1113, 1116 (Fed. Cir. 1987); <u>DeMarini Sports, Inc. v.</u>

<u>Worth, Inc.</u>, 239 F.3d 1314, 1324 (Fed. Cir. 2001).

  Terms in a patent document are to be construed with the meaning with which they are

presented in the patent document. <u>Merck & Co. v. Teva Pharms. USA, Inc.</u>, 347 F.3d 1367,

1371 (Fed.Cir.2003).  An inventor must use words in the same way in the claims as in the

specification.  <u>See</u> <u>Autogiro Co. of Am. v. United States</u>, 384 F.2d 391, 397 (Ct. Cl. 1967).

  Characterizations in the Summary of the Invention regarding the "present invention" are

strong evidence of limitations on the claims.  <u>SciMed Life Systems, Inc. v. Advanced</u>

<u>Cardiovascular Systems, Inc.</u>, 242 F.3d 1337, 1343 (Fed. Cir.2001).

  In the absence of a clear indication in the patent that a special definition is to be applied

to the claim, however, the words in a claim "are to be given their ordinary meaning." <u>Gentex</u>

<u>Corp. v. Donnelly Corp.</u>, 69 F.3d 527, 530 (Fed. Cir. 1995).  This "ordinary meaning" is how the

words of the claim would be understood by a person skilled in the relevant art.  <u>See</u>, e.g.,

<u>Phillips</u>, 415 F.3d at 1313 ("the ordinary and customary meaning of a claim term is the meaning

that the term would have to a person of ordinary skill in the art in question at the time of the

invention, i.e., as of the effective filing date of the patent application.").

  When there is an equal choice between broader and narrower meanings of a disputed

claim term, it has been held that a court should adopt the narrower meaning, as this best serves

9

the notice function of patents. <u>Athletic Alternatives, Inc. v. Prince Mfg., Inc.</u>, 73 F.3d 1573, 1581 (Fed.Cir. 1996).

If the meaning of the claim limitations is apparent from the totality of the intrinsic evidence, then the claim has been construed. If, however, after consideration of all of the intrinsic evidence a claim limitation is still not clear, the court may look to extrinsic evidence to help resolve the ambiguity. Relying on extrinsic evidence to construe a claim term is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." <u>Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.</u>, 132 F.3d 701, 706 (Fed. Cir. 1997). "Such instances will rarely, if ever, occur." <u>Vitronics</u>, 90 F.3d at 1585. Further, "extrinsic evidence in general, and expert testimony in particular, . . . may not be used to vary or contradict the [intrinsic record] . . . " <u>Id.</u> at 1584.

Differences among claims can sometimes be a useful guide in understanding the meaning of particular claim terms. See <u>Laitram Corp. v. Rexnord, Inc.</u>, 939 F.2d 1533, 1538 (Fed.Cir.1991). It is generally true, for example, under the theory of claim differentiation, that an independent claim should not be construed as requiring a limitation added by a dependent claim. <u>Karlin Tech., Inc. v. Surgical Dynamics, Inc.</u>, 177 F.3d 968, 971-72 (Fed.Cir.1999). However, "[c]laim differentiation is a guide, not a rigid rule." <u>Laitram,</u> 939 F.2d at 1538. Claim differentiation "only creates a presumption that each claim has a different scope." <u>Seachange International, Inc. v. C-Cor, Inc.</u>, 413 F.3d 1361, 1369 (Fed.Cir.2005).

Finally, as part of the claim construction process, it is well-established that the court may not redraft the claims. <u>Process Control Corp. v. HydReclaim Corp.</u>, 190 F.3d 1350, 1357 (Fed. Cir. 1999<u>), cert. denied</u>, 529 U.S. 1037 (2000); <u>Quantum Corp. v. Rodime, PLC</u>, 65 F.3d 1577, 1584 (Fed.Cir.1995). Redrafting of claims is not permitted even if the proper claim construction

would render the claims invalid and/or nonsensical. Id. While it has been said that claims should be construed to preserve their validity, the Federal Circuit has not applied that principle broadly, and has certainly not endorsed a regime in which validity analysis is a regular component of claim construction. Phillips, 415 F.3d at 1327. See also Hoganas AB v. Dresser Industries, Inc., 9 F.3d 948, 951 (Fed. Cir. 1993) ("It would not be appropriate for us now to interpret the claim differently just to cure a drafting error made by [the patentee]. That would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention.").

## IV.    DEFENDANTS' PROPOSED CONSTRUCTIONS AND ANALYSIS IN SUPPORT

The claim phrases and terms presently in dispute all appear in Claim 1 of the '064 patent, the only independent claim of the patent in suit. The disputed claims terms are shown below in boldface type:

> A dispensing apparatus for dispensing a product from a container, said apparatus comprising:
>
> a container;
>
> a product chamber within the container;
>
> a **tilt valve** adjacent to the product chamber and having a valve stem provided with an external thread;
>
> a **hinge assembly** attached to the container;
>
> a lever hingedly attached to the hinge assembly and comprising a bearing portion; and
>
> a **nozzle assembly sealingly engageable with the hinge assembly** and provided with an internal thread engaged with the external thread of the valve stem,
>
> the **nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions** of said nozzle assembly and including an **actuator portion** provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes movement of the actuator portion to open the valve and permit flow of the product out of the apparatus.

### A.    "Tilt valve"

The term "tilt valve" should be construed to mean "a conventional off-the-shelf valve as generally known and widely used in dispensing apparatuses in which the valve is designed to be opened by tilting a hollow stem of the valve which is resiliently held on a container mounting cup by a rubber grommet." This construction is based on the description of a "tilt valve" that is contained in three places in the specification.

In. col. 1, lines 45-52, the specification recites

"Tilt valves are **generally known in dispensing apparatus and operate by tilting of a hollow central which is resiliently held on a mounting cup by a rubber grommet**. The stem is closed at its lower end by a sealing plate. When the stem is tilted, the seal between the grommet and the sealing plate is broken and the product can reach apertures in the central stem and thence flow along the hollow stem." (emphasis added).

In col. 3, lines 14-16, the specification states:

The valve is a tilt valve of the type **widely used in pressurised dispensers** and operated by tilting the valve stem. (emphasis added).

In col. 5, lines 36-38, the specification states:

The valve, being an **off the shelf tilt valve** having only three parts, namely the stem 30, grommet 38 and mounting cup 44 may be obtained cheaply and easily. (emphasis added).

As can be seen from the bolded text of the above specification descriptions, Defendants' proposed construction is essentially drawn directly from these descriptions. Defendants' construction does not attempt to import structural limitations from the specification, but rather focuses on two essential features of the claimed tilt valve, namely, (1) the tilt valve is designed to operate in a tilt fashion, (2) the tilt valve is of the type widely used at the time of the filing of the patent and is an off-the-shelf, conventional valve.

12

Defining the tilt valve as being designed to operate when tilted is axiomatic in view of the use of the word "tilt" to describe the valve. In addition, all of the three excerpts from the specification make it clear that the tilt valve operates by tilting it.

That the tilt valve is an "off the shelf" type valve is necessary to satisfy one of the major objectives of the '064 patent. As stated in col. 1, line 15, one of the objectives of the '064 patent was to reduce the cost of components. The patent in suit contemplates achieving this objective by employing cheap, widely-used, off-the-shelf, conventional tilt valves that do not need to be designed especially for use in a vertical fashion in such lever-operated dispensing devices as contemplated by the patent in suit.

Plaintiff apparently contends that the term "tilt valve" should encompass any valve that can be used in either an up-down or tilt fashion. See the Joint Claim Construction Chart filed May 26, 2006 in this matter, attached as Exhibit 6 to the Chin Declaration submitted herewith. Plaintiff's overly-broad construction would encompass the use of valves that are simply not tilt valves, valves that are not "off-the-shelf," "cheaply and easily" obtained, or "of the type "widely used" in pressurized dispensers." It would ensnare valves that, unlike the off-the-shelf tilt valves spoken of in the '064 specification, are specifically designed to be used in an up-down fashion. Tilting the stem of such "vertical" valves is outside of their intended purpose and normal operation. Even if such valves may be forced open by tilting, they should not be encompassed by the Court's construction of "tilt valve" as that term is used in the '064 patent.

Claim terms must be viewed in the context of the specification of which they are a part. Markman, 52 F.3d at 979. Here, the patentee took particular care to point out multiple times that the use of a conventional, off-the-shelf tilt valve was an advantage of the alleged invention of the patent in suit, and then amended the claims of the patent in suit during prosecution to limit all of

13

the claims to such a tilt valve. See the Preliminary Amendment dated October 9, 2002, at RL 0791, attached as Exhibit 4 to the Chin Declaration submitted herewith. The patentee should be held to what he described and claimed.

**B.     "Hinge assembly"**

The term "hinge assembly" should be construed to mean a hinge with a mechanism for attaching the hinge to a container. In the invention of the '064 patent, a lever is pivotally attached to the hinge assembly. To this extent, Defendants' proposed construction does not differ markedly from that provided by Plaintiff in the Joint Claim Construction Memorandum (Chin Exhibit 6) submitted by the parties. Defendants merely emphasize here that the "lever" has been recited as a separate and distinct claim element, and does not become part of the hinge assembly upon attachment thereto. Therefore, a correct construction of the claim term "hinge assembly" cannot include the lever as comprising a portion of the hinge assembly. The specification clearly supports this construction, since it describes the hinge assembly and the lever separately, as different components having different compositions. See the '064 patent Col. 1, lines 30-31; Col. 3, lines 12-14 and 43-56; and Col. 5, lines 29-33.

**C.     "A nozzle assembly sealingly engageable with the hinge assembly"**

Within this claim phrase, there are three subparts that need to be construed: (1) "nozzle assembly," (2) "sealingly engageable with," and (3) "hinge assembly." Since the term "hinge assembly" has been construed above, two questions remain: (a) What is the nozzle assembly? and (b) What relationship between the nozzle assembly and the hinge assembly is defined by "sealingly engageable with"?

The "nozzle assembly" of the '064 patent should be construed to mean a tapered tube mounted on the valve stem. When the valve is opened, the product is dispensed through the

14

valve stem and the tapered tube. The nozzle assembly includes the nozzle and may include other components, such as (a) an end cap to cover the dispensing tip, (b) fins or flanges to facilitate finger rotation of the nozzle; and (c) dog teeth which can enter slots on the hinge assembly as described elsewhere in the specification of the '064 patent.[2] This construction is directly supported by the description in the specification. See the '064 patent, Col. 2, lines 9-19; Col. 3, lines 57-61; Col. 5, lines 5-8.

The parties' proposed constructions of the term "nozzle assembly," like their constructions for the term "hinge assembly," do not differ markedly. However, there is stark disagreement regarding the meaning of the words "sealingly engageable with" and how they relate the nozzle assembly to the hinge assembly

The words "sealingly engageable with" should be construed to refer to direct physical contact between the nozzle assembly and the hinge assembly, causing a seal to be formed at the place of such contact, which prevents fluid from flowing between the nozzle assembly and the hinge assembly. The plain contextual meaning of the words "sealingly","engageable", and "with" dictates such a construction.

The applicable dictionary definition of the word "engage" is "to contact, mesh or interlock with." See Chin Exhibit 5. The definition of the word engage thus requires direct contact between the structures that are engaged. "Engageable" means "able to engage." Therefore, in context, the nozzle assembly must be able to come into contact with the hinge assembly. See, e.g. Primos, Inc. v. Hunter's Specialties, 2006 U.S. App. LEXIS 14525 at *15-16, attached as Exhibit 4 to the Chin Declaration.

---

2 Additionally, claim 1 contains language that describes other requirements of the nozzle assembly.

In <u>Primos</u>, the controversy was whether the word "engaging" meant "to come into contact with" or "sealing or interlocking." The claims at issue employed both the word "sealing" and the word "engaging." Because each word was presumed to have a distinct meaning, the Federal Circuit agreed with the district court that engaging meant "to come into contact with." This aligns with Defendants' proposed construction of "engageable" to mean "able to come into contact with," since the words "sealingly" and "engageable" also both appear in claim 1 of the '064 patent.

The pertinent definition of the word "seal" is to form a tight or perfect closure, as against the passage of gas or water. In the claim phrase at issue, the adverb "sealingly" modifies "engageable," thus describing what happens when the nozzle assembly comes into contact with the hinge assembly: a seal - a tight and perfect closure, as against the passage of gas or water - is formed. See the apt definition of "seal" in Webster's Third New International Dictionary, Chin Exhibit 5. "Sealingly" also serves to define the particular type of engagement that is created at the point where the nozzle assembly and hinge assembly come into contact with each other: one that is "sealing" - i.e., one that forms a tight and perfect closure, as against the passage of gas or water.

"With," in context, simply means that "sealingly engageable" describes a particular relationship between the nozzle assembly and the hinge assembly, specifically, that the nozzle assembly and the hinge assembly are the direct and only participants in any such sealing engagement.

Thus, the engagement that occurs between the nozzle assembly and hinge assembly must cause the seal and that the seal must be at the point of engagement. Therefore, the full claim phrase "nozzle assembly sealingly engageable with the hinge assembly" must be construed to

16

require two things:  1) the ability, in normal operation of the apparatus, to cause direct physical contact between the nozzle assembly and the hinge assembly; and 2) such contact causes a seal; and 3) the seal is formed at the juncture of contact so as to prevent leakage or between the nozzle assembly and the hinge assembly.

The patentee did not attempt to redefine "sealingly engageable with" in the specification to mean something other than the plain and ordinary meaning of the words.  While the specification does employ variants of the word "seal," these refer variously to the sealing of the valve, or to forming a seal between the valve stem and the nozzle.[3]  However, in none of these instances is there any mention, suggestion or indication of any sealing in conjunction with any relation or engagement between the nozzle and the hinge assembly, and so such instances are of no relevance or utility in construing this claim phrase.

Likewise, the specification employs variants of the word "engage" at several points[4], but none in conjunction with any description of any relation between the nozzle assembly and the hinge assembly, or in conjunction with any description of any "sealing."  It being clear that the patentee made no attempt to be his own lexicographer, the only proper construction of the words "sealingly engageable with" within the context of the entire claim phrase is the plain and ordinary contextual meaning of those words.  Gentex, 69 F.3d at 530.

In contrast, Plaintiff has said in its proposed construction that "sealingly engageable" refers to the nozzle assembly being configured such that closing of the valve causes the nozzle to engage with the hinge assembly "through" or "by means of " the lever so as to seal the valve.

---

[3] See the '064 patent, at Col. 1, lines 49-50; Col. 3, lines 19, 23, 26, 28, 32, 34, 38, 39 and 41; Col. 4, line 52, and Col. 5, lines 9, 10, 14 and 15.

[4] See the '064 patent, at Col. 1, line 57; Col 4, line 51 and Col. 5, line 19.

See the Joint Claim Construction Chart, Chin Exhibit 6. This construction is improper for many reasons: (1) it improperly rewrites the claim language to substitute the lever for the hinge assembly, (2) it is directly contradictory to what is described in the portion of the specification cited by Plaintiff in support of such construction, and (3) it improperly contorts the plain and ordinary meaning of the words used, subverting the fair notice principles of patent law.

Plaintiff's proposed construction identifies the "engagement" that occurs between the hinge assembly and the nozzle as occurring "through" or "by means of" the lever. However, Plaintiff's proposed construction would effectively substitute the word "lever" for the words "hinge assembly." It speaks only of direct contact between the nozzle and the lever and does not envision any direct contact between the hinge assembly and the nozzle assembly, despite the fact that the lever is not recited in the claim term.[5] As explained above in the discussion of Defendants' construction of the term "hinge assembly," the hinge assembly and lever are separately recited claim elements. To adopt this proposed construction, the claims would have to be rewritten to say "nozzle assembly sealingly engageable with the *lever*." Such a rewriting of the claim language is impermissible. Process Control Corp., 190 F.3d 1350 at 1357.

Plaintiff's construction is also incorrect because it flatly contradicts the description contained in the very portion of specification that plaintiff cites in support of its construction. In Col. 5, line 58- col. 6, line 11, the specification describes the operation of how the lever is used to open the valve. In particular, it describes how the user presses down on the lever, which pushes against the nozzle assembly and the valve stem. See col. 6, lines 1-4. At the point in time when the user pushes down on the lever, the lever first engages with the nozzle. However,

---

5 Furthermore, the claim goes on to separately and explicitly describe the relation between the nozzle assembly and the lever, when it speaks of the "nozzle assembly… provided with a surface which cooperates with the lever bearing portion."

18

rather than creating any seal therewith, this engagement breaks the seal of the valve, causing the valve to open and allowing the product to come out of the container. Thus, Plaintiff's contention that the engagement of the lever and the nozzle assembly creates a "seal" – much less a seal between the nozzle assembly and the hinge assembly - is completely contradicted by the specification.

Plaintiff attempts to circumvent that contradiction by also positing when the valve closes, it "causes the nozzle to engage with the hinge assembly" to seal the valve. {Joint Claim Construction Chart, Chin Exhibit 6). This is double-talk; when the valve closes, the lever is *dis*engaging from the nozzle assembly, not engaging with it. To interpret "engage" to mean "disengage" – its exact opposite – is absurd, and amounts to a rewriting of the claim. Also, by design, when the valve closes, it also seals, not due to any interaction between the nozzle and the hinge assembly, but because, contextually, a closed valve *is* a sealed valve.

Also, the closing of the valve does not *cause* the nozzle to engage with the lever, as Plaintiff states. If the valve is open, it is because the nozzle and lever must already be engaged.

Plaintiff's construction also ignores the grammatical connection of the words "sealingly engageable with," attempting to separate "sealing" from "engagable." Plaintiff would have the "sealing" take place at a distance from and not include either of the components that are supposedly "engageable with" one another, and not occur upon engagement, but upon *dis*engagement. This is not what the claim says. The adverb "sealingly" modifies "engageable," informing the reader as to a characteristic of the engagement, not of some remote event. The language of the claims is simply not amenable to Plaintiff's construction, and the Court should not endorse it.

**D.**    **"The nozzle assembly being rotatable ... between open and closed positions"**

The claim phrase "the nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions of said nozzle" describes two discrete nozzle assembly positions: one open position, and one closed position. The closed position of the nozzle assembly is one in which movement of the lever does not result in product being dispensed; that is, the closed nozzle position disables the valve. The open position of the nozzle is one in which product can be dispensed at a predetermined rate. The '064 patent specification supports such a construction. See the '064 patent, Col. 2, lines 4-6; Col. 3, line 62 - Col 4, line 2; and Col. 4, lines 41-46, each of which refer to a single open position of the nozzle.

**E.**    **"Actuator portion"**

The claim phrase "actuator portion provided with a surface which cooperates with the lever bearing portion" means that there must be "a portion with a cam surface at the lower end of the nozzle assembly" with which a portion of the lever (the lever bearing portion) comes into contact. The claim further goes on to specify that the lever can bear upon this surface to actuate (i.e., open) the valve when the nozzle is in the open position. Defendants' proposed construction of the term "actuator portion" as requiring a cam surface is properly informed by reference to the specification. SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc. 242 F.3d 1337 (Fed.Cir. 2001) ("[T]he written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.").

Indeed, the requirement that the actuator portion of the nozzle assembly must have a cam surface is evident from the Summary of the Invention, which describes not any particular embodiment, but the invention as a whole. There, in Column 1, lines 34-36, the patentee clearly

states that in the "present invention" of the patent in suit, the "actuator portion [is] provided with a cam surface." The Federal Circuit has found characterizations in the "Summary of the Invention" of the "present invention" to be strong evidence of limitations on the claims. Id. at 1343. Similarly, in Biogen, Inc. v. Berlex Laboratories, Inc., 318 F.3d 1132 (Fed. Cir. 2003) the Federal Circuit affirmed a lower court ruling construing claims to be consistent with the patentee's limiting characterization in the Summary of the Invention in the specification. Other cases have similarly construed patent claims so as to be consistent with the patentee's characterization of the invention, even though the claims on their face could be read more broadly. See, e.g., Cultor Corp. v. A.E. Staley Manufacturing Co., 224 F.3d 1328, 1331 (Fed. Cir. 2000); Laitram Corp., 143 F.3d at 1463 (construing term "driving surface" to mean flat driving surface based on patentee's description of the invention in the "Summary of the Invention" portion of specification); Wang Laboratories, Inc. v. America Online, Inc., 197 F.3d 1377, 1383 (Fed. Cir. 1999).

Additionally, the specification is replete with descriptions of embodiments of the alleged invention, each having an actuator portion with some sort of cam surface, and each describing how those respective cam surfaces effect the operation of the alleged invention. See Col. 1, lines 34-36 and lines 58-64; Col. 4, lines 13-17 and lines 40-43; Col. 6, lines 12-31. The specification teaches the reader that the cam surface of the actuator portion is one of the patentee's major inventive contributions, in all disclosed iterations of the alleged invention.

In fact, there is neither any teaching nor even any suggestion in the specification of any sort of actuator portion which does not have a cam surface, nor of how the alleged invention of the patent in suit would function without one. "Actuator portion" is not a common term of art; its construction requires context from the specification, and the specification teaches only the use

21

of a cam surface.

In addition to being faithful to the specification, Defendants' proposed construction of this claim term does not run afoul of the theory of claim differentiation. While dependent claim 3 does specify that the surface of the actuator portion is a cam surface, it also requires the actuator portion to comprise a *ring member*. Since the *ring member* requirement is not recited in claim 1, the scope of claims 1 and 3 are not coterminous under Defendants' proposed construction, rendering the doctrine of claim differentiation inapposite to a proper construction of this claim term. In addition, claim differentiation is merely a guide, and not a rigid rule. Laitram, 939 F.2d at 1538.

## V.    SUMMARY AND CONCLUSION

This Court need only following the ample guidance provided by the Supreme Court and Federal Circuit to arrive at the proper construction of the disputed terms. In doing so, the Court can confidently rely upon the ordinary and customary meaning of the claim language, as viewed through the lens of the public record, i.e., the intrinsic evidence of the patent in suit, to construct the disputed terms as urged by Defendants. Defendants respectfully request that the Court construe the disputed terms in accordance with the Defendant's proposed constructions.

Date: June 30, 2006            By:        /s/ John G. Harris
                                           John G. Harris, Esq. (No. 4017)
                                           Reed Smith LLP
                                           1201 Market Street, Suite 1500
                                           Wilmington, DE 19801
                                           Tel. (302) 778-7500
                                           Fax (302) 778-7557

OF COUNSEL:
Lloyd McAulay
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Tel. (212) 521-5400
Fax: (212) 521-5450