IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCEP LUSOL HOLDINGS LIMITED, )<br>)<br>Plaintiff/Counterclaim Defendant, )<br>)<br>v. )<br>)<br>PERMATEX, INC., and ULTRAMOTIVE )<br>CORPORATION, )<br>)<br>Defendants/Counterclaimants. ) | Civil Action No. 05-141-KAJ |

**PLAINTIFF ROCEP LUSOL HOLDINGS LIMITED'S
MEMORANDUM ON CLAIM
<u>CONSTRUCTION FOR U.S. 6,685,064</u>**

Respectfully submitted,

ROCEP LUSOL HOLDINGS LIMITED


DAVID P. PRIMACK (#4449)
Drinker Biddle & Reath LLP
1100 North Market Street, Suite 1000
Wilmington, DE 19801-1254
Tel: 302-467-4224
Fax: 302-467-4201

ROBERT E. CANNUSCIO
Drinker Biddle & Reath LLP
One Logan Square, 18th & Cherry Streets
Philadelphia, PA 19103-6996
Tel: (215) 988-3303
Fax: (215) 988-2757

Attorneys for
ROCEP LUSOL HOLDINGS LIMITED

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

I. NATURE OF THE CASE AND OF PROCEEDINGS ................................................ 1
II. INTRODUCTION ........................................................................................................ 1
III. LEGAL STANDARDS FOR PATENT CLAIM CONSTRUCTION ......................... 1
IV. THE PATENT IN SUIT ............................................................................................... 5
V. PROPER CONSTRUCTION OF THE CLAIMS OF THE PATENT IN SUIT ......... 6

    A. "Tilt valve" means "a valve that, when not otherwise constrained, opens when a portion of the valve (the valve stem) is tilted or displaced axially relative to a seal." ........................................................... 7

    B. "Hinge assembly" means "a hinge that is attached to the container and to which another component is pivotally attached." .............................. 8

    C. "A nozzle assembly sealingly engageable with the hinge assembly" means "a nozzle and any other components which may be connected to the nozzle, such as an end cap or actuator, the nozzle and other components being configured such that it can, in certain conditions, engage with the hinge assembly, for example by means of the lever, and can form a seal." ......................................................................... 10

    D. The "nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions of said nozzle assembly" means "the nozzle assembly rotates relative to the hinge assembly, rotating to any desired position between open and closed positions." ........................................................................................... 13

    E. The "nozzle assembly… including an actuator portion provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes movement of the actuator portion to open the valve and permit flow of the product out of the apparatus" means that "the nozzle assembly includes an actuator that is the base of the nozzle assembly and that includes an upper surface that receives the bearing portion when the lever is depressed, thereby forcing the nozzle assembly to push the valve stem downward, opening the valve." ............................................. 15

VI. CONCLUSION ......................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Becton Dickinson & Co. v. C.R. Bard Inc.*, 922 F.2d 792 (Fed. Cir. 1990) ..............................4

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327 (Fed. Cir. 2003) ......................................................................................................................................2

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111 (Fed. Cir. 2004) ......................................................................................................................................2

*Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ..................................................................................................................................2, 3

*McCarty v. Lehigh Valley R.R.*, 160 U.S. 110 (1895)..................................................................4

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ................3

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...................................................1 – 4, 8

*Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901 (Fed. Cir. 2005) ......................14

*Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999) ........................4

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370 (Fed. Cir. 1999) ........................2

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) ..............................2

*Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991) ..................................2

*Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576 (Fed. Cir. 1996) ....................................3, 4

## MISCELLANEOUS

Random House Webster's Unabridged Dictionary, 2nd ed., p. 1328 (2001) ............................14

## I. NATURE OF THE CASE AND OF PROCEEDINGS

This case involves a claim for patent infringement. Plaintiff Rocep Lusol Holdings Limited ("Rocep") is the owner of US Pat. 6,685,064 ("the '064 Patent") which claims a novel dispensing apparatus. Rocep has brought an action against Ultramotive Corporation ("Ultramotive") and Permatex, Inc. ("Permatex") for infringement of the '064 Patent.

The parties have concluded discovery and, pursuant to the Scheduling Order, this motion for claims construction is being filed.

## II. INTRODUCTION

A patent is a legal instrument, and therefore the construction of patent claims[1] is a legal question for the court. Claim construction becomes the law of the case, and forms the basis of the court's instructions to the jury that govern the jury's determination of patent infringement. As a legal instrument, a patent is interpreted under much the same guidelines commonly applied to other legal documents such as statutes and contracts. That means the plain language prevails unless there is a demonstrated reason to depart from it.

## III. LEGAL STANDARDS FOR PATENT CLAIM CONSTRUCTION

1.  Patent claims define the boundaries of the patented invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (noting it is a "bedrock

---

[1] The claims of a patent define the boundaries of legal protection the patent affords – much like a deed defines the physical boundaries of real property. The claims not only define the boundaries the patentee's right to exclude, they also give notice to the public of what "territory" is reserved to the patentee.

principle" of patent law that the claims delimit the scope of the patentee's rights) (citations omitted).

2. Construction of patent claims is a matter of law for the court. *Markman v. Westview Instruments*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). It is the court's role to determine the proper meaning and scope of the claims, always using the language of the claims as the touchstone. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1375 (Fed. Cir. 1999). As the Federal Circuit explained,

> In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention. The terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. Moreover, unless compelled otherwise, a court will give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art.

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201-02 (Fed. Cir. 2002) (internal citations omitted).

3. "[T]he words of a claim 'are generally given their ordinary and customary meaning,'" (citations omitted) *Phillips*, 415 F.3d at 1312, which is the meaning they would have to a person of ordinary skill in the art at the time of the invention. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003).

4. To determine the ordinary and customary meaning, the court must initially "consider three sources: the claims, the specification, and the prosecution history." *Phillips*, 415 F.3d at 1312 (*quoting Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir.

1991)). The three sources are often referred to as "intrinsic evidence." *Markman*, 52 F.3d at 979.

5. Analysis of the intrinsic evidence begins with the claims themselves, *Phillips*, 415 F.3d at 1314, and looks at the context in which a claim term is used. The context is instructive because it puts the claim term in its proper setting.

6. The claims, however, do not stand alone. "Rather, they are part of 'a fully integrated written instrument,' *Markman*, 52 F.3d at 978 consisting principally of a specification that concludes with the claims." *Phillips*, 415 F.3d at 1315. For this reason, claims "[are] read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979; *see also Phillips*, 415 F.3d at 1313 (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Thus, any interpretation of the claims must include an analysis of the specification to determine how the claim terms are used. If the specification fails to elucidate the claim terms, either explicitly or implicitly, the prosecution history[2] can be examined to understand the meaning of claim terms. *Phillips*, 415 F.3d at 1317.

7. Although the primary focus in claim construction is on the intrinsic evidence, the Federal Circuit has authorized district courts, when necessary, to rely on evidence

---

[2] Prosecution history comprises those documents relating to the patent application proceedings in the Patent Office. The documents include actions by an applicant and/or his agent and official actions by the Patent Office.

external to the patent and prosecution history (*e.g.*, expert reports and testimony, dictionaries, treatises). *Phillips* 415 F.3d at 1317. Such evidence is called "extrinsic evidence." A court may use extrinsic evidence to assist it in understanding technical concepts in the claims, or as evidence of how those skilled in the art would understand the claim language. *Vitronics*, 90 F.3d at 1584. While courts may rely on extrinsic evidence, it is generally considered less reliable than intrinsic evidence. *Phillips* 415 F.3d at 1318-1319. Moreover, "[if] an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term . . . it is improper to rely on extrinsic evidence." *Vitronics Corp.*, 90 F.3d at 1583. Consequently, a court should discount extrinsic evidence that contradicts or is inconsistent with the intrinsic evidence. *Phillips* 415 F.3d at 1319.

8.  While it is the court's duty to construe the claims, the court may not – in the course of its claim construction – redraft them. *Process Control Corp. v. HydReclaim Corp.* 190 F.3d 1350, 1357 (Fed. Cir. 1999); *see also Becton Dickinson & Co. v. C.R. Bard Inc.*, 922 F.2d 792, 799 n.6 (Fed. Cir. 1990) ("Nothing in any precedent permits judicial redrafting of claims."). Although the court may (and should) refer to the specification and other intrinsic evidence in order to interpret claim ambiguities, the court must guard against importing extraneous matter from the specification or other source when the claim language does not *require* it. As the Supreme Court explained,

> [W]e know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement. The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim . . ., we should never know where to stop.

*McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895).

## IV. THE PATENT IN SUIT

There is one patent in suit: US Pat. 6,685,064 ("the '064 Patent"), Exhibit A.[3]

The '064 patent issued on February 3, 2004, and is based on a PCT application filed on December 22, 2000, which claims priority from Great Britain application 9930773 filed on December 30, 1999. [Exhibit B] The PCT application, PCT/GB00/04967, as originally filed included 15 claims. [Exhibit C] Those claims formed the basis for the claims that were filed in the United States application, Application Serial No. 10/169,290, but were amended in a first preliminary amendment filed with the national application on June 28, 2002. [Exhibit D- 66 to D- 71] The first preliminary amendment made non-substantive modifications to the claims to eliminate multiple dependencies and provide proper antecedent basis for some of the terms.

A second preliminary amendment was filed on October 9, 2002. [Exhibit D- 35 to D-39] This preliminary amendment included more substantive amendments to the claims including the cancellation of original claims 3-5, 10, 13 and 14, and the amendment of claim 1 to identify the "valve" as a "tilt valve", and to include threads on the valve stem and the inside of the nozzle assembly. The second preliminary amendment notes that the amendments were made to place the claims in better form for examination. Since this application originated in the United Kingdom, the claims that were nationally filed in the United States had a British flavor to them. It is quite customary to amend foreign originating claims so that they are in better form for examination in the United States.

---

[3] All exhibits are enclosed in a separately bound Appendix filed concurrently herewith.

During prosecution of the application, there were no substantive rejections of the claims made by the United States Patent and Trademark Office ("USPTO"). A Notice of Allowance was issued by the USPTO which included the following statement from the Examiner regarding his reasons for allowing the claims: "the prior art fails to disclose or render obvious a dispensing apparatus in combination with the other claimed limitations of claim 1". The Examiner went on to restate the language of the nozzle assembly recited in claim 1. [Exhibit D-11 to D-14]

As allowed, the '064 patent includes 9 claims. Of those claims, only claims 1, 2 and 6 are currently asserted against the Defendants' allegedly infringing products. The text of those claims are presented in Exhibit A-10 to A-11.

## V.   PROPER CONSTRUCTION OF THE CLAIMS OF THE PATENT IN SUIT

Rocep provided the Defendants a chart listing claim terms from the '064 Patent and Rocep's initial interpretation of those terms. A copy of Rocep's chart is attached as Exhibit E. In response, the Defendants' provided Rocep with a chart listing the terms that the Defendants' contend are in dispute and therefore require construction by the Court. A copy of the Defendants' chart is attached as Exhibit F. The disputed claim terms were filed with the Court in the Submission of Joint Claim Construction Chart. [Exhibit G] Those disputed terms are: "tilt valve," "hinge assembly," "a nozzle assembly sealingly engageable with the hinge assembly," "nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions of said nozzle assembly," and "nozzle assembly... including an actuator portion provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes

movement of the actuator portion to open the valve and permit flow of the product out of the apparatus." Proper construction of the disputed claim terms are discussed below. Other than the disputed claim terms discussed below, the Defendants' did not dispute any other terms listed in the Rocep chart. Therefore, the Defendants' are presumed do have adopted Rocep's interpretation to those non-disputed other terms. The Court should do the same.

**A.   "Tilt valve" means "a valve that, when not otherwise constrained, opens when a portion of the valve (the valve stem) is tilted or displaced axially relative to a seal."**

"Tilt valve" can be readily understood from the intrinsic evidence by viewing the term in the context in which it is used in the specification of the '064 Patent. The specification states that a tilt valve is a well known component. *See* '064 Patent, col. 1, ll. 45-46 and col. 3, 13-16. The specification goes on to describe the term as a valve that opens by tilting a portion of the valve (*i.e.,* the valve stem). *See* '064 Patent, col. 1, ll. 45-52; and col. 3, ll. 39-43. However, the specification does not limit the term to valves that are only opened by tilting. Instead, the specification describes an embodiment where the tilt valve can not only being opened when tilted, but that can be opened when a portion of the valve is displaced axially relative to a seal. *See* '064 Patent, col. 3, ll. 25-39.

Figures 4 and 7a in the '064 Patent, and the text in the specification corresponding to those figures, further support the above described interpretation of tilt valve. These Figures show two directions, depicted by arrow A and arrow B, in which the valve stem can be displaced so as to open the valve. When the valve stem is pushed in the direction of arrow A, the valve is displaced axially relative to a seal, thereby opening the valve. This action is described in the specification as follows:

> When the stem 30 is pushed in the direction of arrow A relative
> to the mounting cup 44, the sealing disc 36 is pushed away

> from the grommet 38, and material in the canister 12 is free to pass between the sealing disc 36 and grommet 38, through apertures 32, along the inner bore of the stem 30 and through the open end 34 of the stem. When the stem is released, the resilience of the grommet 38 pushes the stem back in a direction opposite to arrow A and seals the valve again.

'064 Patent, col. 3, ll. 31-39. When the valve stem is pushed in the direction of arrow B, the valve stem is tilted, thereby opening the valve. This action is described in the specification as follows:

> If the stem is pushed to one side in the direction of arrow B, one side of the sealing disc 3 is pushed away from the grommet 38, and material in the canister 12 is again free to pass between one side of the sealing disc 36 is pushed away from the grommet 38, through the apertures 32, and out of the stem 30.

'064 Patent, col. 3, ll. 39-43. Thus, the term "tilt valve" is not limited to a valve that opens only by tilting. Instead, a tilt valve as recited in the present claims is any valve that can be opened by lateral displacement of a valve stem or by lateral and axial displacement of a valve stem.

Because the intrinsic evidence provides a sufficient definition of tilt valve, resort to extrinsic evidence (*e.g.*, expert reports, treatises, dictionaries) is not necessary. Moreover, extrinsic evidence that states that a tilt valve is a valve that can only be opened by tilting is "clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history," and therefore should be discounted. *Phillips*, 415 F.3d at 1318.

**B.    "Hinge assembly" means "a hinge that is attached to the container and to which another component is pivotally attached."**

"Hinge assembly" can be readily understood from the intrinsic evidence by viewing the term in the context in which it is used in the specification. The specification states that a

hinge assembly "is moulded from plastic and comprises a ring 60 and a central aperture 62." *See* '064 Patent, col. 3, lines 44-46. The specification further states that the hinge assembly is attached to the container by, for example, snapping onto an outer flange of the container. *See* '064 Patent, col. 3, lines 46-48. In addition, the specification states that the hinge assembly includes an area "adapted to house the ends of a wire lever 18, thereby forming a hinge for the lever." *See* '064 Patent, col. 3, ll. 50-52. In short, the specification defines the hinge assembly as an object, attachable to a container, to which another object (*e.g.*, a lever) is pivotally attached.

The figures in the '064 Patent further support the above-described definition of hinge assembly. *See e.g.,* '064 Patent, Figs. 7d and 7e (showing the hinge assembly as 16). Figures 7d and 7e show that the hinge assembly 16 is a ring having, at a minimum (1) a hinge area to which another component can be pivotally attached, and (2) a means to attach to a container. Figures 4 – 6 show that a lever can be attached to the hinge assembly such that the lever can pivot about the hinge assembly. Figures 4 – 6 also show that the hinge assembly can be attached to a container.

Therefore, based on the specification (including the drawings), the Court should interpret "hinge assembly" to mean "a hinge that is attached to the container and to which another component is pivotally attached."

Because the intrinsic evidence provides a sufficient definition of hinge assembly, resort to extrinsic evidence is not necessary.

      C.    **"A nozzle assembly sealingly engageable with the hinge assembly" means "a nozzle and any other components which may be connected to the nozzle, such as an end cap or actuator, the nozzle and other components being configured such that it can, in certain conditions, engage with the hinge assembly, for example by means of the lever, and can form a seal."**

To better understand "a nozzle assembly sealingly engageable with the hinge assembly," the phrase is separated into its constituent parts.

          1.    *"Nozzle" means "a tapered conduit through which a product being dispensed from the container flows."*

The term "nozzle" does not seem to be in dispute. The term can be readily understood from the intrinsic evidence by looking at the Figures and the corresponding descriptive text in the specification. The specification describes the shape of the nozzle where, for example, it refers to the nozzle as "an elongate tapering nozzle." *See* '064 Patent, col. 3, ll. 57 – 58. The elongate tapering shape of the nozzle is also graphically represented in the figures. *See* '064 Patent, Figures 1 – 6, and 7g. The function of the nozzle is also described in the specification in that it describes that, in operation, product is "urged to flow, by virtue of the internal pressurisation of the pack… out through the nozzle 80." *See* '064 Patent, col. 6, ll. 5 – 8.

The description of nozzle as described above is further supported by the way the term is generally understood by those of ordinary skill in the art. For example, the dictionary definition of "nozzle" is "a projecting spout, terminal discharging pipe, or the lie, as of a hose or bellows." *See* Random House Webster's Unabridged Dictionary, 2nd ed., p. 1328 (2001). Because the dictionary definition is consistent with the intrinsic evidence, the Court may rely on it. *See Vitronics*, 90 F.3d at 1584.

      2.    *"Nozzle assembly" means "a nozzle and components connected to the nozzle, such as an actuator."*

"Nozzle assembly" can be readily understood from the intrinsic evidence by looking at the specification. The specification states that the "nozzle assembly 20 *comprises* an elongate tapering nozzle 80..." *See* '064 Patent, col. 6, ll. 5 – 8. In patent law, the term comprises is synonymous with "includes," "contains," or "is characterized by." The term is open-ended, meaning that is does not exclude additional, unrecited elements. *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("Comprising," as used in patent claims, means that the recited elements are essential, but other elements may be added and still fall within the scope of the claim.). As a result, a nozzle assembly is not limited merely to a nozzle; it can include more. As detailed in the specification, that "more" includes a "base" that "serves as an actuator to control the opening of the valve." *See* '064 Patent, col. 4, ll 13 – 15. Thus, as described in the specification and illustrated in the figures, the nozzle assembly includes a nozzle and a base with an actuator.

      3.    *"Sealingly engageable" means a nozzle assembly being configured such that closing of the valve causes the nozzle to engage with the hinge assembly through the lever to seal the valve.*

"Sealingly engageable" can be readily understood from the intrinsic evidence by looking at the specification. The specification describes how the nozzle, during operation, engages the hinge assembly so as to seal against flow through the nozzle. *See* '064 Patent, col. 3, ll. 12 – 52. More specifically, the nozzle and valve operate such that, when the valve is open, the nozzle is in contact with the hinge assembly through the lever. The pressure within the container and the displaced state of the rubber of the valve push the valve stem and nozzle (which is threaded onto the valve stem) upwards, against the lever which is pivotally attached to the hinge assembly, causing the lever to pivot about the hinge assembly

as the valve seals. Col. 5, line 58 – Col. 6, line 11. Furthermore, during opening of the valve, the pivoting of the lever about the hinge attachment point forces the nozzle assembly and the valve stem downward, thereby unsealing the valve.

Based on the disclosure in the specification, it is clear that neither "engageable" nor "sealingly" are extraneous verbiage. That is, each term provides distinct meaning to the claim with the term "engageable" referring to the engagement of the hinge assembly with nozzle assembly by way of the lever, and the term "sealingly" referring to the interrelation that engagement has on the sealing and unsealing of the valve. The language assists in defining the functional interaction between the hinge assembly, the lever, the nozzle assembly and the valve during opening and closing of the valve.

    4. *Combining the individual components of the phrase, one should reach Plaintiff Rocep's proposed claim construction.*

Putting the individual components together, it becomes clear that "a nozzle assembly sealingly engageable with the hinge assembly" can be readily understood from the specification to mean "a nozzle and any other components which may be connected to the nozzle, such as an end cap or actuator, the nozzle and other components being configured such that it can, in certain conditions, engage with the hinge assembly, for example by means of the lever, and can form a seal." The specification describes how the nozzle assembly, lever and hinge assembly, *i.e.*, "the nozzle/hinge sub-assembly" (*see* '064 Patent, col. 5, ll. 31-33 (noting that "the nozzle assembly 20, the hinge assembly 16 and the lever 18 can be preassembled to form a complete nozzle/hinge subassembly")), work together to seal the valve of the container. *See* '064 Patent, col. 5, l. 58 – Col. 6, l. 11.

As described, in operation, when the nozzle assembly is at least partially twisted relative to hinge assembly (*i.e.*, partially opened), the nozzle assembly rises, causing

the lever, which is engaged with the top surface of the nozzle assembly, to rotate about the hinge assembly and rise into an actuating position. *See* '064 Patent, col. 5, ll. 58 – 67, Figures 2(a) and 2(b). To dispense the product, the user then operates the lever, pivoting the lever about the hinge point, which results in the bearing portion of the lever forcing down the upper surface of the nozzle assembly's base, causing the nozzle assembly to axially displace the valve stem, thereby unsealing the valve. *See* '064 Patent, col. 6, ll. 1 – 8. Upon release of the lever, a series of interconnected movements occur. '064 Patent, col. 6, ll. 1 – 11. The pressure in the container and the resiliently deformed state of the valve urge the valve and the valve stem upwards. *Id.* The rising of the valve stem causes the nozzle assembly to rise because the nozzle assembly is threaded onto the stem. *Id.* This rising of the nozzle assembly pushes the bearing portion of the lever, which is in contact with the upper surface (the actuator portion) of the nozzle assembly's base, upwards. *Id.* The rising of the lever causes the lever to rotate about its attachment point with the hinge assembly, while at the same time the valve seals.

Therefore, based on the intrinsic evidence, the Court should construe "a nozzle assembly sealingly engageable with the hinge assembly" to mean "a nozzle and any other components which may be connected to the nozzle, such as an end cap or actuator, the nozzle and other components being configured such that it can, in certain conditions, engage with the hinge assembly, for example by means of the lever, and can form a seal."

**D.    The "nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions of said nozzle assembly" means "the nozzle assembly rotates relative to the hinge assembly, rotating to any desired position between open and closed positions."**

The "nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions of said nozzle assembly" can readily be understood from

the intrinsic evidence by viewing the phrase in the context in which it is used in the claims and the specification. Claim 1 recites that the nozzle assembly is rotatable *"between* open and closed positions." The word "between" is readily understood to mean that there is a continuum of points that exists from a first point (*e.g.*, a closed position) to a second point (*e.g.*, an open position). *See e.g.*, Random House Webster's Unabridged Dictionary, 2nd ed., p. 1328 (2001) (defining "between" as "in the space separating (two points, objects, etc.): *between New York and Chicago*"). That continuum of points, in the context of the claims, relates to the various rotatable positions of the nozzle assembly that exist from a closed position to an open position. In other words, as recited in the claims, the rotatable positions of the nozzle assembly are not limited to merely a closed position and one open position.

The specification supports a reading of the claim phrase that the nozzle assembly can be rotated to a continuum of positions. As described in the specification, the nozzle assembly can be configured "so that the valve can be actuated in *any rotational position* of the nozzle, the *degree of rotation* determining the extent to which the valve will open when actuated." col. 6, lines 23-28 (emphasis added).[4] The phrases "any rotational position" and "degree of rotation" clearly indicate that the nozzle assembly is not limited to merely two positions, an open position and a closed position, but rather can be rotated so as to be closed or in various stages of open.

---

[4] The specification also discloses *an embodiment* where rotation of the nozzle assembly is limited by two end stops (*see* '064 Patent, col. 3, l. 62 to col. 4, l. 2). However, this is simply one embodiment of the invention. The claims are not and cannot be limited to this one embodiment. *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005). In fact, it is improper for a court, in construing the claims, to import limitations of one embodiment of the specification into the claims where the claim language does not require that limitation. *Id.* The language in Claim 1 does not require import of limitations into the claims to define open and closed positions. Therefore, the Court should not do so.

A helpful analogy can be drawn between the opening and closing of the nozzle assembly and the opening and closing of a window. A window, like the nozzle assembly, can be in a closed position. A window, again like the nozzle assembly, can be in various stages of open. The window can be slightly cracked, allowing just a small amount of air into a building or the like; the window can be wide open, allowing large amounts of air into the building; or the window can be anywhere between in the continuum between slightly cracked and wide open. Regardless of whether the window is slightly cracked, wide open, or somewhere in between, the window is considered open. The same can be said of the nozzle assembly, *i.e.*, regardless of whether the nozzle assembly is slightly rotated, fully rotated, or somewhere in between, the nozzle assembly is considered open.

Therefore, the Court should construe "nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions of said nozzle assembly" to mean "the nozzle assembly rotates relative to the hinge assembly, rotating to any desired position between open and closed positions."

**E.     The "nozzle assembly... including an actuator portion provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes movement of the actuator portion to open the valve and permit flow of the product out of the apparatus" means that "the nozzle assembly includes an actuator that is the base of the nozzle assembly and that includes an upper surface that receives the bearing portion when the lever is depressed, thereby forcing the nozzle assembly to push the valve stem downward, opening the valve."**

The meaning of "the nozzle assembly... including an actuator portion provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes movement of the actuator portion to open the valve and permit flow of the product out of the apparatus" can be readily understood from the intrinsic evidence by viewing the term in the context in which it is used in the specification.

As disclosed in the specification, the nozzle assembly includes a base that "serves as an actuator to control the opening of the valve..." *See* '064 Patent, col. 4, ll 13 – 15. The actuator includes a upper surface that operates in conjunction with the bearing portion of the lever such that, when open, operation of the lever forces the surface downward thereby forcing the valve to open. *See e.g.*, '064 Patent, Figures 4-7 and associated discussion in the specification; *see also* Section IV.C.4, *supra*.

Because the intrinsic evidence clearly describes the existence and function of the actuator portion of the nozzle assembly, resort to extrinsic evidence (*e.g.*, expert reports, treatises, dictionaries) is not necessary. Therefore, the Court should construe "nozzle assembly… including an actuator portion provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes movement of the actuator portion to open the valve and permit flow of the product out of the apparatus" to mean that "the nozzle assembly includes an actuator that is the base of the nozzle assembly and that includes an upper surface that receives the bearing portion when the lever is depressed, thereby forcing the nozzle assembly to push the valve stem downward, opening the valve."

## VI.   CONCLUSION

Consistent with Federal Circuit precedent, Rocep's proposed claim term constructions follow the intrinsic evidence of the patents and the relevant extrinsic evidence to their logical conclusion. Therefore, Rocep's proposed claim term constructions should be adopted as the legal basis for the factual determinations of infringement and claim validity.

                                                             Respectfully submitted,

                                                             ROCEP LUSOL HOLDINGS LIMITED

Dated:    June 30, 2006               BY:   /s/ David P. Primack

                                                            DAVID P. PRIMACK (#4449)
                                                           Drinker Biddle & Reath LLP
                                                           1100 North Market Street, Suite 1000
                                                           Wilmington, DE 19801-1254
                                                           Tel: 302-467-4224
                                                           Fax: 302-467-4201

                                                           ROBERT E. CANNUSCIO
                                                           Drinker Biddle & Reath LLP
                                                           One Logan Square, 18th & Cherry Streets
                                                           Philadelphia, PA  19103-6996
                                                           Tel: (215) 988-3303
                                                           Fax: (215) 988-2757

                                                           Attorneys for
                                                           ROCEP LUSOL HOLDINGS LIMITED