**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ROCEP LUSOL HOLDINGS LIMITED,    )
                                 )
Plaintiff/Counterclaim Defendant, )
                                 )
v.                               )    Civil Action No. 05-141-KAJ
                                 )
PERMATEX, INC., and ULTRAMOTIVE  )
CORPORATION,                     )
                                 )
Defendants/Counterclaimants.     )

**FINAL PRETRIAL ORDER**

This matter comes before the Court at a final pretrial conference held

pursuant to Rule 16, Federal Rules of Civil Procedure.

Plaintiff(s) Counsel:

>ROBERT E. CANNUSCIO
>Drinker Biddle & Reath LLP
>One Logan Square, 18th & Cherry Streets
>Philadelphia, PA  19103-6996

>DAVID P. PRIMACK (#4449)
>Drinker Biddle & Reath LLP
>1100 North Market Street, Suite 1000
>Wilmington, DE 19801-1254

Defendant(s) Counsel:

>LLOYD MCAULAY
>STEPHEN M. CHIN
>Reed Smith LLP
>599 Lexington Avenue
>New York, NY  10022

>THAD BRACEGIRDLE (No. 3691)
>Reed Smith LLP
>1201 Market Street, Suite 1500
>Wilmington, DE  19801

## I.    Nature of the Case

The present case involves a claim of patent infringement.  The Plaintiff, Rocep Lusol Holdings Limited was awarded United States Patent No. 6,685,064. This patent is directed to a lever operated dispensing valve for a pressurized can.

The Defendant, Ultramotive Corporation makes pressurized cans with a lever operated dispensing valve and sells those products to Permatex, Inc.  Permatex, Inc., in turn, sells those products across the country.

Rocep Lusol Holdings filed the instant lawsuit against Ultramotive and Permatex claiming that certain of the products made by Ultramotive and sold by Permatex infringe one or more claims in United States Patent No. 6,685,064. Ultramotive and Permatex deny that their products infringe and contend that United States Patent No. 6,685,064 is invalid.

## II. Jurisdiction

A.    This is an action for:

1.    Plaintiff seeks a finding of patent infringement of United States Patent No. 6,685,064 by products made used and sold by Defendants.

2.    Defendants seek a finding of non-infringement of United States Patent No. 6,685,064.

3.    Defendants seek a declaratory judgment that the asserted claims in United States Patent No. 6,685,064 are invalid.

4.    Plaintiff seeks a permanent injunction against Defendants, and those officers, directors, agents, employees and any person or entity in active concert or participation with any of them from infringing United States Patent No. 6,685,064.

5.    Plaintiff seeks an order requiring Defendants to deliver up for destruction all infringing dispenser products in their possession or under their control.

6.    Plaintiff seeks monetary damages under 35 U.S.C. § 284 sufficient to compensate Plaintiff for the financial damage caused by Defendants' infringement.

7.    Plaintiff seeks an enhancement of damages under 35 U.S.C. § 285 for willful infringement.

8.    Both sides have requested that the Court find the case to be exceptional and award reasonable attorney fees.

B.    The jurisdiction of the Court is not disputed.

1.    The basis for jurisdiction is established by:

35 U.S.C. §§ 271 and 281.

28 U.S.C. §§ 1331, 1332 and 1338.

## III.    Uncontroverted Facts

The following facts are not disputed or have been agreed to or stipulated to by the parties:

PHIP\529132\1                                    - 3 -

1.   United States Patent No. 6,685,064 issued on February 3, 2004 ("the '064 patent").

2.   The '064 patent describes and claims a lever-operated dispensing system for use on pressurized cans.

3.   The inventor of the '064 patent is Bernard Frutin.

4.   The owner of the '064 patent by assignment is Rocep Lusol Holdings Limited ("Rocep" or "Plaintiff"), the plaintiff in the case.

5.   The '064 patent was based off of an international application filed on December 22, 2000, which claims priority from Great Britain application 9930773 filed on December 30, 1999.  Under US patent law, the '064 patent is entitled to a priority filing date of December 30, 1999.

6.   The '064 patent includes 9 claims.  Of those claims, claims 1, 2 and 6 are currently asserted in this case.

7.   In deciding to issue the patent, the examiner noted the following regarding his reasons for allowing the claims:

> "the prior art fails to disclose or render obvious a dispensing apparatus in combination with the other claimed limitations of claim 1: 'a nozzle assembly sealingly engageable with the hinge assembly and provided with an internal thread engaged with the external thread of thevalve stem, the nozzle assembly being rotatable relative to the hinge assembly and the lever between open and closed positions ofs aid nozzle assembly and including an actuator portion provided with a surface which cooperates with the lever bearing portion such that in the open position of said nozzle assembly operation of the lever causes movement of the actuator portion to open the valve and permit flow of the product out of the apparatus."

8.      Defendant Permatex, Inc. ("Permatex" or "Defendant") is a subsidiary of Illinois Tool Works ("ITW").    Permatex is a distributor of a pressurized dispensing can sold under the trademark POWERBEAD.

9.      The POWERBEAD dispenser can is one of the products that Plaintiff alleges infringes claims 1, 2 and 6 of the '064 patent.

10.     The POWERBEAD dispenser can was first introduced by Permatex at the end of 2002.

11.     The POWERBEAD dispenser can is manufactured by Defendant Ultramotive Corporation ("Ultramotive" or "Defendant").

12.     Ultramotive manufactures and sells dispensing canisters, including a lever-operated dispenser can.  Ultramotive refers to its line of dispensing cans as ULTRAPAK.    Permatex refers to this line of dispensing cans as POWERBEAD. The POWERBEAD dispenser cans and the ULTRAPAK dispenser cans are referred to in this case as the Accused Products.

13.     Each Accused Product is dispensing can or container that include an internal chamber that contains a product to be dispensed, such as a silicone.

14.     The Accused Products include a valve that opens to permit dispensing of product.

15.     The Accused Products include a wire lever that is attached to a hinge or platform.  The hinge is attached to the container such that the arms of the

wire lever extend around each side of the valve.

16.  Rotation of the nozzle in the Accused Products transitions the lever into a position where the lever can be actuated to open the valve and dispense the product.  When the lever is depressed, it causes the nozzle to open the valve, thereby allowing pressure within the can to force product out.

17.  When the lever is released, the internal pressure of the container coupled with the resiliency of the grommet portion of the valve causes the valve to move the nozzle up, closing the valve while positioning the lever back into position to dispense.

18.  Since April 2005, Ultramotive has sold the Accused Products only to Permatex.

19.  Between October 6, 1998  and May, 2002, Ultramotive did not make any sales of the Ultramotive lever-operated dispensing can.

20.  In May, 2002, Ultramotive sold 3210 units of the Ultramotive lever-operated pressurized dispensing can to VersaChem Corp.

21.  PCT application publication WO99/01080 ("the PCT publication") is a patent application by Bernard Frutin, the inventor of the patent in suit.

22.  The PCT publication was published on April 15, 1999.

23.  The PCT publication is prior art to the patent in suit.

24.  U.S. Patent Application Serial Number 09/085,440 was abandoned and did

not result in the issuance of a patent.

25.    U.S. Patent 6,340,103 issued on January 22, 2002.

26.    In an amendment dated October 9, 2002, the patentee amended the "valve" limitation of the asserted claims of the patent in suit by adding the word "tilt," so that the limitation now reads "tilt valve."

**Fact Contentions in Dispute**

The parties dispute the following fact contentions:

Plaintiff's Fact Contentions

1.    Ultramotive has manufactured and sold pressurized lever-operated dispensing cans that include all the elements of claim 1 of the '064 patent since at least March 10, 2005.

2.    Ultramotive has manufactured and sold pressurized lever-operated dispensing cans that include all the elements of claim 2 of the '064 patent since at least March 10, 2005.

3.    Ultramotive has manufactured and sold pressurized lever-operated dispensing cans that include all the elements of claim 6 of the '064 patent since at least March 10, 2005.

4.    Permatex has offered for sale and sold pressurized lever-operated dispensing cans that include all the elements of claim 1 of the '064 patent since at least March 10, 2005.

5.   Permatex has offered for sale and sold pressurized lever-operated dispensing cans that include all the elements of claim 2 of the '064 patent since at least March 10, 2005.

6.   Permatex has offered for sale and sold pressurized lever-operated dispensing cans that include all the elements of claim 6 of the '064 patent since at least March 10, 2005.

7.   The POWERBEAD dispensing can sold by Defendants includes a valve that dispenses liquid from a pressurized can when tilted.

8.   The POWERBEAD dispensing can that includes the HUG II valve dispenses liquid from a pressurized can when tilted.

9.   The '064 patent describes two different versions of the dispenser; one version which includes cams on the nozzle assembly to raise the lever, and a second version that uses threads on the nozzle assembly to raise the lever.  The asserted claims in the '064 patent are related to the threaded version.

10.   Defendants have no factual evidence to contest the damages assessment presented in the Expert Report of Glenn Newman.

11.   Bernard Frutin has developed dispensing systems for decades.

12.   Bernard Frutin is a person skilled in the art of the dispensing apparatuses of the general type at issue in this litigation.

13.   Defendants have had knowledge of the '064 patent since at least March 10, 2005.

14. Defendants have continued to sell the Accused Products since at least March 10, 2005.

15. Defendants' continued manufacture and sale of the Accused Products after March 10, 2005 was done willfully.

16. Defendants have not produced an opinion of counsel in this case to establish that they do not infringe.

17. Defendants cannot identify which POWERBEAD products manufactured and sold prior to January 1, 2006 do not include a Hug II valve.

18. A HUG II valve dispenses product when the nozzle is tilted.

19. Defendants have no factual evidence to establish by clear and convincing evidence that a product having all the elements of the asserted claims was on sale prior to December 30, 2000.

20. Defendants have no factual evidence to establish by clear and convincing evidence that the asserted claims of the '064 patent are invalid under 35 U.S.C. 102 or 103.

21. Defendants' sales of the Accused Products have inhibited sales in the United States of products licensed by Rocep.

22. Permatex approached Ultramotive for a product to compete with a product on the market that was licensed by Rocep.

23. Permatex has offered for sale and sold at least one Accused Product that

literally infringes at least one claim of the '064 patent since at least March 10, 2005.

24.    Permatex has offered for sale and sold at least one Accused Product that infringes at least one claim of the '064 patent since at least March 10, 2005 under the doctrine of equivalents.

25.    Ultramotive has offered for sale and sold at least one Accused Product that literally infringes at least one claim of the '064 patent since at least March 10, 2005.

26.    Ultramotive has offered for sale and sold at least one Accused Product that infringes at least one claim of the '064 patent since at least March 10, 2005 under the doctrine of equivalents.

27.    At least one version of the Accused Products sold up until December 2005 ("universal valve version") included a valve that Defendants admit dispensed product when the valve was tilted.

28.    The Accused Products include a nozzle that is attached to the valve and can be rotated from a closed position to an open position.

29.    Defendants have failed to produce clear and convincing evidence of sales or offers for sale of Accused Product before November 25, 2002.

30.    Defendants have failed to produce clear and convincing evidence that the use of Clayton "universal" valves in the Accused Products was discontinued on November 30, 2005.

31.     The '064 patent describes two different versions of the dispenser; one version which includes cams on the nozzle assembly to raise the lever, and a second version that uses threads on the nozzle assembly to raise the lever. The asserted claims in the '064 patent are related to the threaded version.

32.     During prosecution of the application that resulted in the '064 patent, the United States Patent and Trademark Office ("USPTO") reviewed a number of prior art references. It is customary practice at the USPTO for an examiner to indicate that he has reviewed a reference by initialing a document that lists the reference. The examiner handling the '064 patent did that in this case with respect to all the prior art submitted by Mr. Frutin.

33.     It is also the USPTO practice to list all the prior art reviewed by the examiner on the front of the patent. The '064 patent lists the prior art documents that the examiner considered in this case. That list includes a foreign patent application publication WO 9918010 A ("the '010 PCT Publication").

34.     Thus, the examiner considered claims 1-9 in the '064 Patent to be patentable over the prior art that is listed on the front face of the '064 patent, including the '010 PCT Publication.

Defendants' Fact Contentions

1.     Chris Scheindel of Ultramotive ("Scheindel") developed dispensing cans which used standard tilt valves in a vertical fashion as early as May, 1961.

2.     Scheindel first sold pressurized dispensing cans employing a lever-actuated valve in June 1990.

- 11 -

3.     In September 1998, Scheindel developed a wire lever operated dispensing can which employed all of the elements of the Accused Products except that it employed a standard conventional tilt valve.  The valve in this can was actuated vertically to dispense product.  The wire lever was removable and reusable.

4.     In October, 1998, Defendant Ultramotive made a confidential, unconsummated commercial offer for sale to Locktite of a product embodying all elements of the Accused Products, except that the product offered employed a standard tilt valve.

5.     The October 1998 offer was more than one year prior to the actual U.S. filing date of the patent in suit.

6.     The actual U.S. filing date of the patent in suit was December 20, 2000, by virtue of the filing of PCT/GB00/049585 on December 20, 2000.

7.     Between October 6, 1998 and May 2002, Ultramotive offered the Ultramotive lever-operated dispensing can for sale.

8.     This dispensing can offered by Ultramotive between October 6, 1998 and May, 2002 was similar in all respects to the Accused Products, except that, it initially employed a standard tilt valve, operated in a vertical fashion.

9.     In May of 2000, Clayton Corporation modified its standard tilt valve so that it would function better in vertical operation.  Ultramotive refers to this valve as the Clayton "universal" valve.

10.      After Clayton introduced the "universal" valve in May of 2000, Ultramotive began using the universal valve in lieu of a standard tilt valve in its lever-operated dispensing can.

11.      The dispensing cans sold to VersaChem embodied all elements of the Accused Products, except that the product offered employed the Clayton universal valve.

12.      Each and every limitation of each asserted claim of the patent in suit is disclosed in the PCT publication.

13.      Plaintiff admits that the PCT publication discloses every limitation of the asserted claims of the patent in suit except that Plaintiff asserts that the PCT publication does not disclose a tilt valve.

14.      On May 27, 1998, Chris Scheindel of Defendant Ultramotive filed U.S. Patent Application Serial Number 09/085,440 ("the '440 application") which disclosed and claimed a lever operated pressurized dispensing device employing a vertically actuated standard tilt valve.

15.      The '440 application disclosed a dispensing apparatus which dispensed by the opening of a standard tilt valve which is moved in a vertical fashion by bringing a hinged lever assembly to bear upon a portion of a nozzle assembly. When the nozzle assembly is raised upon the threaded stem of the tilt valve. This is shown in Figs. 5(a) and 5(b).

16.      The '440 application disclosed every element of every asserted claim of the patent in suit.

17.  If any claim of the patent in suit covers the Accused Products, such claim would also read upon the disclosure of the '440 application.

18.  Snell U.S. Patent No. 5,040,705, which is prior art to the patent in suit, discloses the use of a hinged lever to dispense viscous product from a pressurized can using a tilt valve in a vertical fashion.

19.  Scheindel U.S. Patent 6,340,103 ("the '103 patent"), filed July 18, 2000, discloses the use of a hinged lever to dispense viscous product from a pressurized can by activating a valve in a vertical fashion as done in the Accused Products, except that the '103 patent discloses using a standard tilt valve.

20.  Scheindel U.S. Patent 5,785,301 ("the '301 patent") was filed on April 23, 1996 and is prior art to the patent in suit.

21.  The '301 patent discloses the use of a tilt valve to dispense viscous product from a pressurized container.

22.  The '301 patent discloses operating a tilt valve by vertical displacement to dispense viscous product from a pressurized container.

23.  Chris Scheindel is one skilled in the art of dispensing apparatuses of the general type at issue in this litigation.

24.  Frutin U.S. Patent 4,826,054, which is prior art to the patent in suit, discloses the use of a lever to vertically depress a valve to dispense viscous product from a pressurized container.

25.    There is no description or teaching in the specification of the patent in suit of how to accomplish any sealing engagement of the nozzle assembly with the hinge assembly.

26.    The specification of the patent in suit does not enable one of skill in the art to practice the "sealingly engageable" limitation.

27.    Plaintiff's pending European patent application 04004540.3 and the patent in suit arise from the same parent PCT patent application, and thus have identical initially filed specifications.

28.    In a response to the European Patent Office Action dated July 13, 2005 in the prosecution of that application, the applicant stated the following with respect to the "sealingly engageable" claim limitation:

> "[T]he support in the description for this feature is at page 10, line 25 to page 11, line 1, which describes how the rotation of the nozzle assembly in a clockwise direction causes the nozzle to bear against the valve stem.  In this position the lever cannot be operated because the nozzle assembly cannot be pushed further down, as it engages against the hinge assembly to prevent further downward movement of the valve stem and hence the opening of the valve."

29.    The U.S. application which matured into the patent in suit was published on February 27, 2003 under Publication No. US 2003/0038148 ("the published U.S. application").

30.    There is no description or teaching in the specification of the patent in suit of any actuator portion other than a cam portion on the base of the nozzle assembly.

31.    None of the Accused Products employ a cam portion on the base of the nozzle assembly.

32.    None of the Accused Products employs a tilt valve.

33.    There is no contact between the nozzle assembly and the hinge assembly in any Accused Product.

34.    None of the Accused Products meets every limitation of any asserted claim of the patent in suit.

35.    Defendant Ultramotive developed and employed valves designed solely for vertical actuation for use in the Accused Products, called the "Hug II" and "Ultra" valves.

36.    Some of the Accused Products employ the "Hug II" valve.

37.    Some of the Accused Products employ the "Ultra" valve

38.    Adding the word "tilt" to the claim was a narrowing amendment.

39.    Plaintiff has put forth no evidence to rebut the presumption of surrender of any equivalents to the claim limitation "tilt valve" resulting from this narrowing amendment.

40.    At the August 15, 2006 claim construction hearing, Plaintiffs declined to offer any theory of infringement under the Doctrine of Equivalents argument under Defendants' proposed construction of the "sealingly engagable" claim limitation.

41.    Ultramotive developed and marketed Accused Products before the patent in suit was filed.

42.    Ultramotive began making sales of Accused Products in November 25, 2002, before the patent in suit issued.

43.    The Accused Products were not copied from any product made by or under license from Plaintiff.

44.    Defendants have maintained a good faith belief in non-infringement throughout the litigation.

45.    Defendants have defended themselves in good faith in this litigation.

46.    Third party products in competition with the Accused Products employing lever-operated dispensing packages were on the market in the United States before the patent in suit issued and continue to be on the market in the United States.

47.    Third party products in competition with the Accused Products employing non-lever-operated dispensing packages were on the market in the United States before the patent in suit issued and continue to be on the market in the United States.

48.    Defendant Ultramotive's development and employment in the Accused Products of valves designed solely for vertical actuation weigh against a finding of willful infringement of the patent in suit.

49.    Plaintiff does not mark the patent number on products sold under license, which licensed products are covered by the patent in suit.

50.    The filing of the complaint provided the first actual notice of the patent in suit to Defendants.

51.    Defendants' accused "Right Stuff" products never employed a Clayton "universal" valve.

52.    Defendants' accused "Right Stuff" products have always employed the "Hug II" valve.

53.    Defendant Ultramotive discontinued using the Clayton "universal" valve in any Accused Products on November 30, 2005.

54.    There are three versions of the Accused Products.


IV.    **Issues of Law**

The following are the issues to be decided by the Court:

Plaintiff's Issues of Law

1.    Upon a finding of infringement by the jury, entry of an injunction against the Defendants to prevent further infringement of the '064 patent.

2.    Upon a finding of infringement and an assessment of damages by the jury, entry of an award of damages by the court which would be adequate to compensate Plaintiff for the infringement, but in no event less than a reasonable royalty for the use of the invention by the Defendants, together with interest and costs.

3.     Upon a finding by the jury that the infringement was willful or such other factors as considered by the court, an increase in the damages up to three times the amount of damages assessed.

4.     Upon a finding of infringement by the jury, a finding that that case is exceptional and an award to Plaintiff of its reasonable attorney fees.


Defendants' Issues of Law

1.     The asserted claims of the patent in suit are invalid under the 35 U.S.C. 102(b) on sale bar.

2.     The asserted claims of the patent in suit are invalid as anticipated under 35 U.S.C. 102(b).

3.     The asserted claims of the patent in suit are invalid as obvious under 35 U.S.C. 103(a).

4.     The asserted claims of the patent in suit are invalid under 35 U.S.C. 112 for failure to provide a proper written description as to the "sealingly engageable" and "actuator portion" claim limitations.

5.     The asserted claims of the patent in suit are invalid under 35 U.S.C. 112 for failure of the written description to enable one skilled the art to practice the invention as to the "sealingly engageable" and "actuator portion" claim limitations.

6.     In view of the patentee's bad faith litigation vis a vis the construction of the "sealingly engageable" claim limitation, the Court should award attorney's fees to Defendants under 35 U.S.C. 285.

7.    None of the Accused Products literally infringe the patent in suit, because the Accused Products do not contain one or more of the "tilt valve", "sealingly engageable," and "actuator portion" claim elements.

8.    None of the Accused Products infringe the patent in suit under the Doctrine of Equivalents, because the Accused Products do not contain an equivalent to one or more of the "tilt valve", "sealingly engageable," and "actuator portion" claim elements.

9.    None of Accused Products infringe the patent in suit under the Doctrine of Equivalents, because due to prosecution history estoppel, the claim limitation "tilt valve" is entitled to no range of equivalents.

10.    None of the Accused Products infringe under the Doctrine of Equivalents.  Plaintiff is estopped from asserting any range of equivalents to the "sealingly engageable" limitation because Plaintiff asserted that there were no such equivalents at the claim construction hearing in this litigation.

11.    Defendants' did not willfully infringe the patent in suit.

12.    Defendants' conduct does not make this an exceptional case and no award of enhanced damages should be awarded to Plaintiff.

13.    Any award of damages under 28 U.S.C. § 271 should be computed on the basis of a per unit reasonable royalty.

14.    Any award of damages should be limited to sales of products found to infringe which took place after March 10, 2005, when the complaint in this matter was filed.

15.    No permanent injunction against any Accused Product should be entered in this litigation under the appropriate four-factor test.

## V.    Witnesses (Please note those who will testify by deposition.)

A.    List of witnesses the plaintiff expects to call, including experts:

1    Expert witnesses.

Glenn Newman
1880 John F. Kennedy, 17th Floor
Philadelphia, PA 19103

Mr. Newman is a damages expert and will testify as to the damages in this case.

2.    Non-expert witnesses.

Bernard Frutin - live
Rocep Lusol Holding Limited
Unit 5, Rocep Business Park
Rocep Drive, RENFREW, PA4 8XY
United Kingdom

Christian Scheindel - live or by deposition
Ultramotive Corporation
Cushing Blvd., Bethel, VT  05032

James Eddy - by deposition
Ultramotive Corporation
Cushing Blvd., Bethel, VT  05032

Neil Putnam - by deposition
Ultramotive Corporation
Cushing Blvd., Bethel, VT  05032

Mitchell Bolinsky - by deposition
3 Wyley Lane, Newtown, CT  06470

B.    List of witnesses defendant expects to call, including experts:

1.    Expert witnesses.

None

2.    Non-expert witnesses.

Christian T. Scheindel of Ultramotive Corp. - live

Neil Putnam of Ultramotive Corp. - live

James Eddy of Ultramotive Corp. - live

Darren Farrugia of Permatex Canada, Ltd. - live

Bernard Frutin - live or by deposition

C.    There are no third parties in the action.


D.    Rebuttal Witnesses.    Each of the parties may call such rebuttal witnesses as may be necessary, without prior notice thereof to the other party.


## VI.    Exhibits

As set forth in Local Rule 16.4(4)(6), a table of exhibits is attached hereto as Attachment A.

The parties may identify additional exhibits in rebuttal.

## VII.    Damages

If infringement is found, the damages in this case need to be assessed based on the total amounted of Accused Products determined to infringe.  Under 35 U.S.C. 284, Plaintiff is entitled to damages adequate to compensate Plaintiff for the infringement, but in no event less than a reasonable royalty for the use of the invention by the Defendants, together with interest and costs.  A preliminary expert report was produced by Plaintiff in this litigation assessing damages through January 27, 2006 (based on the numbers produced at that time) to be at least $162,956.00. Testimony and evidence will be presented by Plaintiff at trial to establish damages in excess of that and shall be based on testimony at trial, additional sales of infringing products through the date of entry of an injunction and, interest as set by the court.

If the infringement is found to be willful, Plaintiff requests that the damages be increased by three times to account for such willful infringement, pursuant to 35 U.S.C. 284.

Plaintiff also requests that the case be found to be exceptional and the court award the Plaintiff its reasonable attorney fees.  35 U.S.C. 285.

Defendants contend that there is no infringement and thus that no damages are due. To the extent that infringement is found, Defendants contend that damages are limited to sales of infringing product after the date of filing of the Complaint, March 10,2005.

## VIII.    Bifurcated Trial

<u>Defendants' Request for a Bifurcated Trial</u>

In the interest of fairness and judicial economy, Defendants requests a bifurcated trial. The jury should first consider the issue of liability; and, only if liability is found, they should reconvene for further evidence on the questions of damages and willfulness. Reconvening the jury for a second trial phase to consider damages and willfulness is an efficient use of judicial and public resources. This bifurcation with a single jury can avoid any actual prejudice to the Defendants in the presentation of the evidence and a potential for risk of confusion to the jury. *See Princeton Biochemicals Inc. v. Beckman Instruments Inc., 45 USPQ2d 1757, 1761, n.3 (D. N.J. 1997)* ("This Court is persuaded by the more recent case law which holds that willful infringement is more appropriately determined after liability has been established, thereby avoiding even the possibility of prejudice to a patent defendant's litigation rights. *See also B. Braun Medical Inc. v. Abbott Laboratories, 32 USPQ2d 1211, 1215 (E.D. Pa. 1994)* ("the Court has bifurcated the issue of willfulness. ... [W]illfulness logically should be tried with damages.") (holding that 'judicial convenience will be served by trying damages and willfulness separately from liability'); *see also Johns Hopkins University v. Cellpro, 160 F.R.D. 30, 33 and 36 (D. Del. 1995).* Plaintiffs will not be prejudiced by bifurcation in a short duration trial.

<u>Plaintiff's Opposition to Bifurcation of Trial</u>

Plaintiff moves the Court to deny Defendants' Request for a Bifurcated Trial. The burden on showing the necessity of a bifurcated trial is on the party requesting

- 24 -

Case 1:05-cv-00141-SLR-MPT    Document 84    Filed 12/04/2006    Page 25 of 32

bifurcation, in this case, the Defendants. *See Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F. Supp. 1429, 1434-35 (D. Del. 1989). The Defendants' cannot meet this burden. First, the issues in the case substantially overlap one another. The same witnesses will be testifying about each of the issues. Moreover, many of the facts presented will support more than one issue. In such circumstances, bifurcation is generally not justified. *See e.g., Procter & Gamble Co. v. Nabisco Brands, Inc.*, 604 F. Supp. 1485, 1492 (D. Del. 1985) ("bifurcation will often be inadvisable if there would be a substantial overlap between the issues to be proved at both trials"). Second, the issues in the case are not complex. There is only one patent at issue, and the technology in the patent is not overly complex such that a lay juror will have difficulty understanding the invention. Again, in such circumstances, bifurcation is generally not justified. *Willemijn Houdstermaatschaapij BV*, 707 F. Supp. at 1434 – 1435 (*citing Procter & Gamble Co.*, 604 F. Supp. at 1492) ("courts are less likely to grant bifurcation when the issues to be decided are not particularly complex and a single trial on all issues thus does not carry with it a significant risk that the trier of fact will be confused").

Furthermore, as this Court has recognized, "[p]erhaps the most important consideration for a court ruling on a motion to bifurcate is whether separate trials would unduly prejudice the non-moving party." *Willemijn Houdstermaatschaapij BV*, 707 F. Supp. at 1435 (*citing H. B. Fuller Co. v. National Starch & Chem. Corp.*, 595 F. Supp. 622, 625 (D. Del. 1984)). A simple delay in the final disposition of the matter is sufficient prejudice to justify denying a request to bifurcate a trial. *Id.* (finding that prejudice to the non-moving party "may simply amount to unfair delay of the final disposition of the matter"). One of Plaintiff's key witnesses is traveling from

PHIP\529132\1                                              - 25 -

oversees to testify in this case. The delay between liability and damages, which could involve considerable deliberations, would unduly prejudice the Plaintiff. Under this Court's standards, Plaintiff, the non-moving party, would be unduly prejudiced by a bifurcated trial. Therefore, the Defendants' Request for a Bifurcated Trial should be denied.

IX.    **Trial Briefs**

Plaintiff submits the following motions in limine.

1. Plaintiff's Motion in Limine to Limit Testimony and Evidence on Invalidity

Plaintiff moves the Court for an order limiting testimony and evidence at trial from Defendants on the issues of invalidity of the '064 patent. Defendants initially plead that the '064 patent was invalid under one or more provisions of USC §§ 102, 103, and/or 112. During the discovery phase of this litigation, the Defendants presented only limited testimony and evidence directed to the issues of invalidity, including in response to interrogatory requests, and on summary judgment. Defendants testimony and evidence should be limited to only the bases and evidence presented during discovery. Specifically, Defendants should be precluded from (i) introducing at trial prior art references not produced during discovery, (ii) raising issues of prior use not presented during discovery, and/or (iii) raising any other invalidity testimony or evidence that was not produced during discovery.

<u>Defendants' Opposition to Plaintiff's Motion in Limine to Limit Testimony and Evidence on Invalidity</u>

Defendants object to this motion to limit testimony and limit issues that may be raised. There are three requests for preclusion.

Defendants do not object to the first of the three items, namely, the item labeled "(i)" providing it is understood that prior art references identified during discovery are understood to be produced.

With respect to item "(ii)", Defendants do not object if it is understood that this request for preclusion is limited to facts not presented in discovery that relate to a prior use issue other than the prior use issues on which facts presented during discovery were directed. That is, a preclusion should relate only to a new prior use issue supported by newly presented evidence.

Defendants object to the request "(iii)" on the ground that it is vague and unclear. Defendants object further that it implies that the testimony provided during the depositions taken by plaintiff's attorney cannot be expanded during trial.


2.    <u>Plaintiff's Motion in Limine to Preclude Testimony and Evidence on Unenforceability</u>

Plaintiff moves the Court for an order precluding testimony and evidence at trial from Defendants on the issues of unenforceability of the '064 patent.

Defendants suggested in their initial pleadings that the '064 patent was unenforceable. However, the initial pleadings did not present any factual evidence to support the issue. Nor was any evidence presented during discovery to provide specific facts of unenforceability. Unenforceability, and in particular accusations of inequitable conduct, must be pled with particularity. *Beauregard v. Mega Sys., LLC*,

350 F.3d 1327, 1344 (Fed. Cir. 2003). That particularity is required by Rule 9(b) of the Federal Rules of Civil Procedure. *See EMC Corp. v. Storage Tech. Corp.*, 921 F. Supp. 1261, 1263 (D. Del. 1996) ("the particularity requirement of Rule 9(b) applies to inequitable conduct charges."); *see also* Fed.R.Civ.P 9(b) (2006) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). Other than a suggestion of inequitable conduct in the Answer, no specific facts were set out in the pleadings and no evidence has been produced in response to specific discovery requests to identify any activities that might constitute inequitable conduct or any other bases for unenforceability. Consequently, any testimony or evidence related to the unenforceability of the '064 patent should not be presented in front of the jury because of its obvious prejudicial effect.

### 3. Plaintiff's Motion in Limine to Limit Opinion Testimony of Christian Scheindel

Plaintiff moves the Court for an order limiting opinion testimony at trial from Mr. Christian Scheindel. Mr. Scheindel was not offered as an expert. He was only identified in the Initial Disclosures as having knowledge of the "design, manufacture, sales and marketing of Ultramotive products." The Scheduling Order required all expert disclosures under Fed. R. Civ. P. 26(a)(2) be filed ninety days before the close of discovery. No such disclosures were filed by the Defendants. As such, Mr. Scheindel's opinion should be treated as one of a lay witness under Fed. R. Evid. 701. As a lay witness, Mr. Scheindel may provide his opinion on what a reference discloses or on other similar technical issues provided that the testimony results from "'a process of reasoning familiar in everyday life,' as opposed to a process

'which can be mastered only by specialists in the field.'" *Estate of Knoster v. Ford Motor Co.*, 2006 U.S. App. LEXIS 22869, *12 (3rd Cir. 2006) (*quoting* Fed. R. Evid. 701 Adv. Comm. Notes); *see also, Corning Inc. v. SRU Biosystems*, 2005 U.S. Dist. LEXIS 22699, *21 (D. Del. 2005) (finding that Defendant's "lay witness may testify regarding his own perceptions and knowledge" of Defendant's background and technology). That is where Mr. Scheindel's opinion testimony should end. *See e.g., Liquid Dynamics Corp. v. Vaughan Co.*, 2004 U.S. Dist. LEXIS 29992, *9 (N.D. III. 2004) (allowing lay witnesses relating to "testify about their personal knowledge[, not their opinion,] of the prior art"). Mr. Scheindel should be precluded from offering testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Specifically, Mr. Scheindel should be precluded from providing opinions on whether a reference or combination of references anticipates or renders obvious the claims of the '064 patent under the patent laws, and what a person of ordinary skill in the art would understand from the prior art. *See e.g., Freedom Wireless, Inc. v. Boston Communs. Group, Inc.,* 369 F. Supp. 2d 155 (D. Mass. 2005) (barring lay opinion testimony on obviousness and triviality where that testimony was based on the witness's technical expertise and specialized knowledge of the technology). Allowing Mr. Scheindel to testify on matters he was not identified as having knowledge about would prejudice Plaintiff and confuse the jury.

<u>Defendant's Opposition to Plaintiff's Motion in Limine to Limit Opinion Testimony of Christian Scheindel</u>

Defendants object to this motion concerning the testimony of Mr. Scheindel. Mr. Scheindel has had a lifetime of experience in the field of pressurized dispensing containers and is as knowledgeable as is anyone can be in that field. One suspects that the same can be said of Plaintiff's main witness, Mr. Frutin.

Whatever reasoning is behind this motion would lead to the need for an independent expert witness in every patent litigation and impose a costly burden on parties in a process that is already too costly and inefficient.

The economic value in many, if not most, patent litigations does not justify the expense incurred by the approach that is behind this motion.

Mr. Scheindel when he appears as a witness can testify as to his technical background and technical experience and at that point can be treated as a witness capable of testifying as one skilled in the art. His experience and background make him a skilled practitioner in this pressurized dispensing container field. The Rules permit one skilled in the art to testify as to the facts which are evaluated by the jury and judge in determining patentability. See, e.g., Corning Inc. v. SRU Biosystems 2005 WL 2465900, *2 (D.Del. 2005); Plymouth Industries, LLC v. Sioux Steel Co. 2006 WL 3392193, *2 (D.Neb. 2006); Liquid Dynamics Corp. v. Vaughan Co., Inc. 2004 WL 2260626, *9 (N.D.Ill., 2004), in which motions in limine to deny testimony on issues relating to invalidity by witnesses such as Mr. Scheindel were denied.

It may be helpful to consider the following statement by the Federal Circuit regarding testimony on the issue of anticipation

> "We have consistently explained what is necessary to show anticipation by a given reference:
>
> Typically, testimony concerning anticipation must be testimony

from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory.

Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC 381 F.3d 1142, *1152 (Fed.Cir.,2004)

The purpose of the rule on Expert witnesses is to avoid bringing in an unqualified person to testify as an expert. It is not to prevent a party from testifying as to information on which he or she has skilled knowledge.

The issue of testifying as a patent expert is not involved. None of the witnesses on either side can provide an opinion as to patentability. That should not be an issue here. The jury and perhaps the Court will decide if there is infringement and if there is validity.

In any case, one would hope that the process of reasoning by specialists in the field and the process of reasoning in everyday life would both be the same reasoning process. The specialists simply have more facts and information to process by reasoning.

## X.    Limitations, Reservations and Other Matters

A. Length of Trial. The probable length of trial is <u>three (3)</u> days. The case will be listed on the trial calendar to be tried when reached.

Mark appropriate box:      Jury          <u>  X  </u>

                           Non-jury      <u>        </u>

B.    Number of Jurors. There shall be six jurors and <u>  2  </u> alternate jurors.

C.    Jury Voir Dire. The Court will conduct voir dire. If voir dire questions are to be tendered, they should be submitted with the final pretrial order.

IT IS ORDERED that this Final Pretrial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice or for good cause shown. Such modification may be made either on application of counsel for the parties or on motion of the Court.

DATED: _____

_____

JUDGE KENT A. JORDAN, U.S.D.J.

APPROVED AS TO FORM AND SUBSTANCE:


_/s/  Robert E. Cannuscio_____

ATTORNEY FOR PLAINTIFF(S)

_/s/  Lloyd McAulay_____

ATTORNEY FOR DEFENDANT(S)